IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GEORGE LINDELL (01) and HOLLY HOAEAE (02),<br><br>Defendants. | CR NO. 13-00512 DKW<br><br>**ORDER (1) DENYING LINDELL'S MOTION TO PARTIALLY UNFREEZE ASSET FOR LIVELIHOOD EXPENSES (DKT. NO. 210); LINDELL'S MOTION FOR IMMEDIATE RETURN OF UNTAINTED PORTION OF SEIZED ASSET (DKT. NO. 292); LINDELL'S MOTION TO VACATE GUILTY VERDICTS (DKT. NO. 294); AND HOAEAE'S JOINDER IN LINDELL'S MOTIONS (DKT. NO. 300); (2) DENYING AS MOOT GOVERNMENT'S APPLICATION FOR A RESTRAINING ORDER, OR IN THE ALTERNATIVE, A SEIZURE WARRANT (DKT. NO. 311); AND (3) GRANTING GOVERNMENT'S MOTION FOR ENTRY OF FORFEITURE MONEY JUDGMENT (DKT. NO. 214)** |

**ORDER (1) DENYING LINDELL'S MOTION TO PARTIALLY UNFREEZE ASSET FOR LIVELIHOOD EXPENSES (DKT. NO. 210); LINDELL'S MOTION FOR IMMEDIATE RETURN OF UNTAINTED PORTION OF SEIZED ASSET (DKT. NO. 292); LINDELL'S MOTION TO VACATE GUILTY VERDICTS (DKT. NO. 294); AND HOAEAE'S JOINDER IN LINDELL'S MOTIONS (DKT. NO. 300); (2) DENYING AS MOOT GOVERNMENT'S APPLICATION FOR A RESTRAINING ORDER, OR IN THE ALTERNATIVE, A SEIZURE WARRANT (DKT. NO. 311); AND (3) GRANTING GOVERNMENT'S MOTION FOR ENTRY <u>OF FORFEITURE MONEY JUDGMENT (DKT. NO. 214)</u>**

## <u>INTRODUCTION</u>

Following a twenty-seven day trial, a jury found Lindell and Hoaeae guilty of operating a Ponzi scheme, as charged in the Second Superseding Indictment, and convicted both defendants of multiple counts of mail and wire fraud.   The jury also found Lindell guilty of four counts of money laundering.

Post-trial, Lindell now challenges the propriety of the Government's February 2012 seizure of his Wells Fargo retirement account.   Lindell further asserts that even if properly seized, a portion of his retirement account should have been released to both cover what he refers to as "livelihood expenses" and to pay for counsel of his own choosing.   According to Lindell and Hoaeae, the failure to do so for the latter purpose deprives both of their Sixth Amendment rights within the meaning of *Luis v. United States*, 136 S. Ct. 1083 (2016), and mandates the vacatur of the jury's guilty verdicts.

Not to be left out, the Government seeks a post-trial restraining order, or alternatively, a new seizure warrant to cover the appreciation of funds in the same Wells Fargo retirement account above the approximately $256,000 that was initially seized more than four and a half years ago.   The Government also moves for entry of a forfeiture money judgment.

Because the Government seized Lindell's retirement account pursuant to a valid 2012 warrant approved by the Magistrate Judge and supported by probable cause, and because all of the funds in that account are "tainted," Defendants' various motions to release the funds and to vacate the jury's verdict are denied.   The Government's application for a further restraining order on that account is moot and is denied on that basis.   The Government's motion for entry of a forfeiture money judgment is granted, with instructions specified below.

## BACKGROUND

### I.    Pretrial Seizure and Charges

In 2010, the FBI began investigating Lindell, Hoaeae and the companies they controlled, The Mortgage Store ("TMS") and True Wealth Group, LLC, Living by Design ("TWG").   The FBI discovered that, from 2005 through November 2010, Lindell and Hoaeae marketed a product known as "The Parking Lot."   Defendants' product received that moniker because investors could "park" their money at

guaranteed rates of return ranging from 6 to 8 percent.   To document Parking Lot

investments, TMS issued a promissory note to investors setting forth the amount of

their investment and the interest rate to be paid.

Although Lindell and Hoaeae represented to potential investors that the funds

deposited in The Parking Lot would be invested in bonds and secured real estate, the

bulk of investor funds was used to make Ponzi payments owed to previous Parking

Lot investors and to personally enrich Defendants.   Lindell and Hoaeae deposited

Parking Lot investor monies into the TMS business bank account, Bank of Hawaii

("BOH") account ending in -3355, contrary to representations to investors that funds

would be deposited in a separate account.   As a result, investor funds were

immediately commingled with other TMS funds, including money not related to the

Parking Lot.   Defendants also used BOH -3355 to make Parking Lot

disbursements.[1]

TMS filed a chapter 7 bankruptcy petition on November 12, 2010.   *See In Re*

*The Mortgage Store, Inc.,* Case No. 10-03454 (Bankr. D. Haw.).   On December 3,

2010, the Bankruptcy Trustee initiated an adversary proceeding against Lindell,

---

[1]BOH -3335 was linked with an automatic bank "sweep" account, which transferred money daily
from TMS's operational checking account to a savings account and then back into the operational
account, as a way to earn greater interest.   Once commingled with TMS's operational account,
Parking Lot investor funds immediately lost their identity amidst TMS business funds.

alleging that Lindell fraudulently transferred millions of dollars of TMS's funds to himself while running a Ponzi scheme, to the detriment of TMS's investors and creditors.   *See Field v. Lindell,* Adv. Proc. No. 10-90146 (Bankr. D. Haw.).   The Trustee and Lindell settled the adversary proceeding pursuant to an October 31, 2011 settlement agreement in which Lindell agreed to a $5,000,000 personal judgment in favor of the Trustee, and the Trustee agreed to exclude a portion of Lindell's retirement accounts from execution.   *See Field v. Lindell,* Adv. Proc. No. 10-90146 (Bankr. Dkt. No. 132), *see also* Exs. B & C. to Govt.'s Collective Mem. in Opp. to Lindell Motions (Klevansky Decl., Settlement Agreement, Stipulated Non-Dischargeable Judgment) (Dkt. No. 316).

On February 16, 2012, the Magistrate Judge approved a seizure warrant for $256,688.46 in funds located in Lindell's Wells Fargo Individual Retirement Account ("IRA") ending in -7984.   The Application and Affidavit in Support of Application for Seizure Warrant, sworn to by FBI Special Agent Steven P. Carter, alleged that probable cause existed to seize the retirement account pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2), and 984.[2]   On May 7, 2012, Lindell's court-appointed counsel filed a claim of ownership with the FBI.   Pursuant to 18

---

[2]The Government froze the funds in place where they have appreciated and remain to date at Wells Fargo.

U.S.C. § 983(a)(3)(A), the Government obtained – with Lindell's agreement – three extensions of time, up to May 28, 2013, in which to file a complaint for forfeiture against the funds in the retirement account.   *See* Misc. No. 12-00238 JMS-KSC. To date, however, the Government has not filed a civil forfeiture complaint against the funds.

On May 23, 2013, a federal grand jury indicted Defendants.   The Indictment was superseded on March 24, 2014 and again on October 23, 2014.   The United States charged Lindell and Hoaeae with mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.   The Government additionally charged Lindell with money laundering in violation of 18 U.S.C. § 1957.   The Second Superseding Indictment included a forfeiture notice for, among other property, $27,000 contained in Wells Fargo -7984, $8,626,588.86, which represented the proceeds of the charged mail and wire fraud offenses, and any property involved in or traceable to the charged transactions in criminally derived property.   Dkt. No. 60 (10/23/14 Second Superseding Indictment).

## II.   <u>Trial and Post-Trial Motions</u>

The evidence adduced at trial established that Lindell and Hoaeae ran the Parking Lot scheme from at least 2005 to 2010, and received gross receipts of $26,671,268.66 in deposits from Parking Lot investors.   The net loss to victims was

$8,988,428.47.   *See* Trial Exhibit O-7.   Lindell and Hoaeae deposited these investor funds in BOH -3355, where they were purposefully commingled with TMS's other funds, enabling Defendants to conceal the ownership of investor funds and to launder the proceeds of the Parking Lot.   Government witnesses testified that investigators utilized the Lowest Intermediate Balance Rule ("LIBR") to trace Parking Lot funds and concluded that 54 percent of the funds deposited into BOH -3355 were proceeds of the Parking Lot scheme during the relevant time periods. Parking Lot funds frequently flowed out of BOH -3355 into Lindell's personal checking account to pay for personal expenses or into his building account for the construction of his personal residence.   Other Parking Lot funds were distributed to Hoaeae in the form of checks or transferred from BOH -3355 to her personal account to pay for her personal credit card debts, vehicles, and expenses.

On April 21, 2015, the Court granted the Government's motion to dismiss Counts 2, 13, and 16, and on May 14, 2015, the Court granted the Government's oral motion to dismiss Counts 5, 11, and 12 as to both Defendants.   On May 27, 2015, the jury returned a guilty verdict against both Defendants on all remaining charges, including the mail fraud offenses set forth in Counts 1, 3-4, and 6-10, and the wire fraud offenses set forth in Counts 14 and 15, of the Second Superseding Indictment. Lindell was additionally convicted of the money laundering charges in Counts 17

through 20.   The jury also returned a Special Verdict Regarding Forfeiture, determining that $27,000 of the funds contained in Wells Fargo -7984 were subject to forfeiture as proceeds of the mail and wire fraud offenses.

On August 14, 2015, Lindell filed a Motion to Partially Unfreeze Asset for Livelihood Expenses, seeking the release of "reasonable livelihood expenses" from the seized Wells Fargo -7984, pursuant to the Fifth and Eighth Amendments.   Dkt. No. 210.   That same day, his court-appointed trial counsel moved to withdraw, which was granted on August 24, 2015.   Dkt. Nos. 209, 215 and 218.

On August 21, 2015, the Government filed a motion for the entry of two money judgments: (1) against both Defendants, jointly and severally, for $8,626,588.86, the amount obtained by Defendants as a result of the mail and wire fraud offenses, as proved at trial; and (2) a money judgment against Lindell only in the amount of $255,000, the amount the evidence at trial established was involved in the transactions in criminally derived property for the money laundering offenses. Dkt. No. 214.

Lindell, then represented by his current court-appointed counsel, filed two motions on May 27, 2016: (1) Motion For Immediate Return Of Untainted Portion of Seized Asset (Dkt. No. 292); and (2) Motion to Vacate Guilty Verdicts (Dkt. No. 294).   Both motions rely on the argument that the initial seizure of Wells Fargo

-7984 was unlawful and that the "untainted" portion of the funds from that account should be released so that Lindell can hire counsel of his choice pursuant to *Luis v. United States*, 136 S. Ct. 1083 (2016).   Since Lindell also argues that the release of funds to hire counsel of choice should have occurred long ago, prior to trial, he asserts that his conviction should be vacated.   Hoaeae joins in Lindell's motions and seeks to vacate her guilty verdict as well, based on the Sixth Amendment and her joint defense agreement with Lindell.   Dkt. No. 300.

On July 15, 2016, the Government filed an Application for a Restraining Order, Or In the Alternative, A Seizure Warrant, For the Contents of Wells Fargo Individual Retirement Account Number ****984 (Dkt. No. 311), seeking to restrain the entirety of Wells Fargo -7984, including any appreciation of funds accrued following the initial seizure in 2012.   According to the Government, the balance of Wells Fargo -7984 now exceeds $400,000.[3]   *See* Govt.'s Collective Mem. in Opp. to Lindell Motions at 12 (Dkt. No. 316).

---

[3]On August 5, 2016, the bankruptcy trustee received a check in the amount of $44,221.49 from Wells Fargo pursuant to an Order of Garnishment, filed on May 17, 2016 in *Field v. Lindell,* Adv. Proc. No. 10-90146 (Bankr. Dkt. No. 255), thereby reducing the funds in Wells Fargo -7984.   *See* Trustee's Notice of Receipt of Payment (Dkt. No. 325).

## DISCUSSION

The Court first addresses Lindell's various motions seeking to unfreeze his retirement account and vacate his verdict before turning to the Government's restraining order application and motion for entry of forfeiture judgment.

## I.      Lindell's Motions For Immediate Return Of Untainted Portion Of Seized Asset (Dkt. No. 292) And To Vacate Guilty Verdicts (Dkt. No. 294)

Lindell's motions are based on the untenable premise that the contents of Wells Fargo -7984 are "untainted" and not subject to forfeiture.   Because that premise is without merit, the related grounds relied upon to unfreeze the asset and vacate the verdict necessarily fail.   Both the motion for immediate return of "untainted" portion of seized asset (Dkt. No. 292) and the motion to vacate guilty verdicts (Dkt. No. 294) are accordingly denied.

### A.      The Initial Seizure and Retention of Funds Was Lawful

Lindell asserts that the Government's initial seizure of Wells Fargo -7984 was unlawful because the Application and Affidavit supporting the February 16, 2012 warrant misapplied controlling law.   Lindell also contends that the Government breached additional duties (1) which arose on May 28, 2013 to return the funds when the Government failed to file a civil forfeiture complaint or to "take the steps necessary to preserve its right to maintain custody of the property as provided in the applicable criminal forfeiture statute," 18 U.S.C. § 983(a)(3)B)(II); and (2) when the

10

First Superseding Indictment was returned on March 25, 2014, which effectively terminated the criminal forfeiture action against all funds in the retirement account in excess of $27,000.   Finally, Lindell argues that the initial seizure improperly restrained more than criminal proceeds.   Each contention is addressed below.

### 1.   The Seizure Warrant Was Valid

The three statutory bases for forfeiture set forth in Special Agent Carter's Affidavit in support of the seizure warrant are 18 U.S.C. §§ 981(a)(1)(C), 982(a), and 984:

> (a) 18 U.S.C. § 981(a)(1)(C), as property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), or a conspiracy to commit such offense.   In the instant case, the alleged specified unlawful activities include mail fraud (18 U.S.C. § 1341) and bank fraud (18 U.S.C. 1344);

> (b) 18 U.S.C. § 982(a)(2), as property constituting, or derived from, proceeds obtained directly or indirectly as a result of a violation of, or conspiracy to violate, 18 U.S.C. §§ 1341 and/or 1344 affecting a financial institution; and/or

> (c) 18 U.S.C. § 984, as fungible funds deposited in accounts of a financial institution within one year from the date of the above-referenced fraud.

Carter Aff. ¶ 9, attached as Ex. 3 to Lindell Motion (Dkt. No. 292).[4]

The retirement account was lawfully seized under the civil forfeiture statute, Section 981(a)(1)(C), as proceeds traceable to a violation of an offense constituting "specified unlawful activity" under Section 1956(c)(7).   It was also lawfully seized pursuant to the criminal forfeiture statute, Section 982(a)(2), as proceeds obtained as a result of a violation of Section 1341 affecting a financial institution.[5]   The crux of Lindell's argument to the contrary is that because Sections 981(a)(1)(C) and 982 are limited to "tainted" funds, the warrant was invalid with respect to the "untainted" portion of Wells Fargo -7984.   However, because all of the funds in the retirement account were "tainted" as a result of Defendants' commingling with specified proceeds, Lindell's argument does not withstand scrutiny.

_____

[4]Lindell asserts that the 2012 seizure warrant was not provided in discovery but does not seek any particular remedy for the alleged non-disclosure.  *See* Dkt. No. 292 at 12.  The Government acknowledges that it cannot now document the 2012 disclosure of the seizure warrant, but claims that it was either informally provided to defense counsel early in the case or inadvertently omitted from the discovery materials provided after advising counsel of the 2012 seizure.  *See* Dkt. No. 316 at 31-32.   As noted, Lindell clearly knew of the seizure – he filed a claim of ownership in 2012 once the account in question had been seized.   Moreover, although the timely disclosure of the 2012 seizure warrant might have prompted Lindell to challenge the seizure of funds at an earlier time, the Government does not object to Lindell's motions on timeliness grounds nor does the Government invoke waiver or laches-type arguments in opposition to the motions. Accordingly, Lindell's comment regarding non-disclosure merits no action at this time.
[5]Because the Government acknowledges that, by 2012, the one-year time period had run for purposes of Section 984, the Court focuses its analysis on the other two statutory bases relied upon in the Affidavit and Application, Sections 981(a)(1)(C) and 982(a)(2).

12

Lindell's retirement account is subject to forfeiture under Section 981(a)(1)(C) as property derived from proceeds of mail and wire fraud offenses. As set forth in Special Agent Carter's Affidavit, Wells Fargo -7984 was opened on September 21, 2009 and funded from a rollover of the balance from the closing of a TMS 401(k) profit sharing plan.   Carter Aff. ¶¶ 26-27 at p. 11.   More specifically, in 2009, Lindell rolled over $220,915.22 from the TMS 401(k) to Wells Fargo -7984.   Carter Aff. ¶ 27(b).   The TMS 401(k), in turn, was funded in part from TMS's primary operational account, BOH -3355, in which substantial Parking Lot investor proceeds were deposited.   In fact, the Government submitted evidence of a July 27, 2007 transfer from BOH -3355 into the TMS 401(k), at which time the *only* funds in BOH -3355 were Parking Lot investor funds.   Carter Aff. ¶¶ 27-29; *see also* Carter Aff. ¶ 30 ("From review of the TMS BOH 3355 account, it was determined that all or part of the investor's funds were used to assist in funding the payments to the TMS 401K retirement plan which was 'rolled' over to benefit the funding of the Lindell IRA in the amount of $220,815.22, which has increased due to market conditions.").

It is undisputed that BOH -3355 contained Parking Lot investor funds – proceeds of what the jury determined to be mail and wire fraud offenses – which were commingled with other TMS funds unrelated to the Parking Lot scheme.   It is

also undisputed that BOH -3355 was the origin of monies used to fund Lindell's

TMS 401(k), which was rolled over in 2009 into Wells Fargo -7984.[6]   The

commingling of investor funds—tainted proceeds—with other TMS funds is

sufficient to taint the entire amount transferred to Wells Fargo -7984.   *See United

States v. Lazarenko*, 564 F.3d 1026, 1035 (9th Cir. 2009) (For purposes of Section

1956 money laundering charges, "the commingling of tainted money with clean

money taints the entire account . . . It is enough that the money, even if innocently

obtained, was commingled in an account with money that was obtained illegally.")

(citing *United States v. English*, 92 F.3d 909, 916 (9th Cir. 1996)).

TMS utilized up to sixteen different accounts to transfer investor funds.

Turner Aff. ¶¶ 23-24.   The Government has sufficiently traced the proceeds using

LIBR, which post-*Luis* decisions look upon with approval.   *United States v.

Marshall*, 2016 WL 3937514, at *5-6 (N.D.W. Va. July 18, 2016) (citing *United

States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159-60 (2d Cir. 1986); *In re

Dameron*, 155 F.3d 718, 724 (4th Cir. 1998)) (adopting lowest intermediate balance

rule to determine whether assets in various bank accounts were "tainted" for

---

[6]The Carter Affidavit states that investigators reviewed TMS bank records and determined that more than $27 million in Parking Lot investor funds were siphoned through BOH -3355 over time. Although $19 million of these investor funds were eventually paid out as return on investment, all of the funds were commingled with non-Parking Lot-related monies in BOH -3355 at one time or another.   Carter Aff. ¶ 26 at p. 8.

purposes of *Luis* analysis)).[7]   In sum, Well Fargo -7984 contained commingled,

tainted funds subject to forfeiture pursuant to Section 981(a)(1)(C).

---

[7]Another court in this district has thoroughly explained LIBR as follows:

> The LIBR is an accounting approach borrowed from the law of trusts to determine the rights of a trust beneficiary to funds in a trustee's bank account.   *See* Restatement (Second) of Trusts § 202(1) comment j (1959).   The LIBR has also been used in the area of secured transactions to trace proceeds in a sale that have been commingled with other funds.   *See Brown & Williamson Tobacco Corp. v. First Nat'l Bank,* 504 F.2d 998 (7th Cir. 1974).   The Second Circuit Court of Appeals first identified the LIBR as an effective method for tracing structured funds in *United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1159 (2d Cir. 1986).   While the Ninth Circuit Court of Appeals has never specifically identified the LIBR as a method used to trace tainted funds, the court has endorsed the accounting principles underlying the LIBR in money laundering cases.   *See United States v. Hanley,* 190 F.3d 1017, 1024–1025 (9th Cir. 1999); *United States v. Rutgard,* 116 F.3d 1270, 1293 (9th Cir. 1997); *see also United States v. Laykin,* 886 F.2d 1534, 1541 (9th Cir. 1989) (endorsing accounting approaches identified in *Banco Cafetero* ); *United States v. Weisberg,* 08–CR–347 (NGG)(RML), 2011 WL 4345100, at *4–5, 2011 U.S. Dist. LEXIS 104222, at *14–16 (E.D.N.Y. Sept. 14, 2011) (characterizing Ninth Circuit's approach to tracing tainted funds commingled with legitimate funds as the LIBR).   In addition, district courts in the Ninth Circuit have used the LIBR as an effective accounting method for tracing structured funds.   *See United States v. Yagman,* 502 F.Supp.2d 1084, 1087–88 (C.D. Cal.2007); *United States v. $3,148,884.40 United States Currency,* 76 F.Supp.2d 1063, 1066–1067 (C.D. Cal.1999); *United States v. Funds Representing Proceeds of Drug Trafficking in the Amount of $75,868.62 Transferred to Account No. 7916944712,* 52 F.Supp.2d 1160, 1164 (C.D. Cal.1999).

> The LIBR is an accounting principal used to calculate which funds are subject to forfeiture in an account containing both tainted and legitimate funds.   *See, Banco Cafetero,* 797 F.2d at 1159.   The LIBR posits that when commingled funds are in an account, legitimate funds are withdrawn first, leaving the tainted funds in the account.   When there is insufficient legitimate funds to cover a specific withdraw, then tainted funds are used to cover the withdraw.   The balance of tainted funds in the account is reduced

Further, the initial seizure of the funds in Wells Fargo -7984 was lawful pursuant to the criminal forfeiture statute, Section 982(a)(2), as proceeds obtained directly or indirectly as a result of a violation of mail and wire fraud affecting a financial institution.   Lindell argues that the warrant is invalid as a criminal seizure warrant because the Application contains no factual basis to support the conclusion that Wells Fargo -7984 contains proceeds of a mail or wire fraud offense which affects a financial institution.   Lindell reads Section 982 too narrowly.   Financial institutions were instrumental in the operation of the Parking Lot Ponzi scheme and Lindell's ongoing concealment of his fraudulent activities.   The Carter Affidavit details several paragraphs of conduct by Lindell "affecting a financial institution,"

---

according to the amount needed to make the withdraw.   This reduced balance of tainted funds is considered the intermediate balance of the tainted funds.   If legitimate funds are added to the account later, the intermediate balance of tainted funds in the account does not increase. Over the course of time, as deposits and withdraws are made into an account, the LIBR keeps track of the intermediate balance of tainted funds in the account.   For example, if an account contains $1,000 of tainted funds and $1,000 of legitimate funds totaling $2,000, then so long as at least $1,000 remains in the account at the time of seizure, $1,000 will be considered tainted and, therefore, subject to forfeiture.   If however, at some point the balance of funds in the account drops below $1,000, for example to $800, and there is no evidence that additional tainted funds were added to the account, the lowest intermediate balance of tainted funds would be at most $800.   Regardless of how much money was in the account at the time of seizure, the LIBR would only allow forfeiture of $800 because that would be the lowest intermediate balance of tainted funds in the account.

*United States v. Haleamau*, 887 F. Supp. 2d 1051, 1056–57 (D. Haw. 2012).

16

including: fraudulently depositing, withdrawing, and transferring Parking Lot

investor funds into BOH -3355 in order to launder those funds; using the 10 percent

Bank of Hawaii Sweep Account; and utilizing the Wells Fargo -7984 and TMS

401(k) accounts, the Wachovia Securities Managed Account and other accounts at

financial institutions to conceal and facilitate fraudulent mail and wire transfers.

*See* Carter Aff. ¶¶ 20; 26-32.   Lindell also made marketing representations to

Parking Lot clients regarding the security and profitability of the Parking Lot as an

investment strategy relative to other "financial institutions" in order to induce clients

to invest with TMS:

> A letter dated April 1, 2008 from TMS, stated that since the
> Parking Lot was so successful they were offering direct deposit
> as a way for investors to receive their monthly interest payment.
> In another letter, undated and signed by Lindell, headed as "The
> Parking Lot", stated "Even though interest rates offered by banks
> and other financial institutions on saving and money market
> accounts have been lowered significantly, we are continuing to
> pay 7% on the money our clients have loaned to us."

Carter Aff. ¶ 21.   The Carter Affidavit further declares:

> The offered interest rate was determined to be attractive as it was
> much higher than a bank offered rate and safer since it was
> guaranteed. . . .   Lindell and Hoaeae advocated and advised a
> prospective investor to mortgage their residence and withdraw
> the excess equity and/or liquidating their retirement accounts,
> stocks and other investment and placing the money with TMS's
> "Parking Lot".   They advocated these investment strategies by
> stating it was safe and guaranteed when compared to other
> investing options like the stock market.

Carter Aff. ¶¶ 18-19.   Although Lindell was not convicted of perpetrating fraud

against the affected financial institutions, his conduct resulted in increased risks of

losses to affected financial institutions and entangled them in civil, criminal, and

substantial bankruptcy litigation.   *See, e.g.,* Lindell Ex. 1 to Response to Govt.'s

Motion for Application for Restraining Order (4/26/16 Wells Fargo Response to

Garnishee Summons & Suter Decl.) and Ex 2 (7/1/16 Wells Fargo Motion for Order

Directing Liquidation of Securities in Garnished Account & Suter Decl.) (Dkt. Nos.

312-2 and 312-3); *United States v. Johnson*, 130 F.3d 1352, 1355 (9th Cir. 1997)

(holding enhanced sentencing guideline applicable where offense "affected" a bank

by causing it legal expenses); *see also United States v. Stargell*, 738 F.3d 1018,

1022-23 (9th Cir. 2013) (Interpreting the phrase "affected a financial institution" in

Section 1343 broadly: "The increased risk of loss presented by fraudulent terms is

sufficient to 'affect' a financial institution.   Regarding the definition of 'affects' in

18 U.S.C. § 1343, we join our sister circuits in defining such term to include new or

increased risk of loss to financial institutions.").

> Three Courts of Appeals have held that an increased risk of loss
> "affects" a financial institution.   The Seventh Circuit, in *United
> States v. Serpico*, upheld a jury instruction stating that, under §
> 3293(2), the defendants "affected the banks if they 'exposed the
> financial institution[s] to a new or increased risk of loss,'" and
> "'[a] financial institution need not have actually suffered a loss
> in order to have been affected by the scheme.'" 320 F.3d 691,

> 694 (7th Cir. 2003).   The Tenth Circuit has similarly concluded
> that a "'new or increased risk of loss' is plainly a material,
> detrimental effect on a financial institution, and falls squarely
> within the proper scope of [§ 3293(2)]."   *Mullins*, 613 F.3d at
> 1278–79 (10th Cir. 2010).   Recently, the Ninth Circuit "join[ed]
> [its] sister circuits" in defining "affects" a financial institution
> "to include new or increased risk of loss to financial
> institutions."   *United States v. Stargell*, 738 F.3d 1018, 1022-23
> (9th Cir. 2013) (interpreting 18 U.S.C. § 1343, and citing *Serpico*
> and *Mullins*).

*United States v. Ghavami*, 23 F. Supp. 3d 148, 162 (S.D.N.Y. 2014), *aff'd sub nom.*

*United States v. Heinz*, 607 F. App'x 53 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 801,

193 L. Ed. 2d 712 (2016) (interpreting Section 3293(2)).[8]   *See also United States v.*

*Bank of New York Mellon*, 941 F. Supp. 2d 438, 452 (S.D.N.Y. 2013) (Surveying

cases, rejecting argument that a financial institution participating in a fraudulent

scheme could not be "affected" because it was not the victim of the scheme).

---

[8] Congress amended 18 U.S.C. § 3293 to add the "affects a financial institution" language in Section 961 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA").   *See* P.L. 101–73, 103 Stat. 183 (Aug. 9, 1989).   FIRREA simultaneously amended and enacted other sections of the United States Code using almost identical language.   *See id.* § 951 (enacting 12 U.S.C. § 1833); *id.* § 961 (amending 18 U.S.C. §§ 1341 and 1343); *id.* § 963 (amending 18 U.S.C. § 982).   Courts have noted that "[w]hether a fraud does or does not 'affect a financial institution' is a recurring consideration in federal criminal jurisprudence" and cases interpreting the phrase in one context often are applied in others.   *United States v. Grass*, 274 F. Supp. 2d 648, 654 n.5 (M.D. Pa. 2003) (internal quotation marks omitted)); *see also United States v. Stargell*, 738 F.3d 1018, 1022–23 (9th Cir. 2013) (interpreting the phrase "affected a financial institution" in 18 U.S.C. § 1343, and citing to cases applying 18 U.S.C. § 3293); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 629–31 (S.D.N.Y. 2013) (Furman, J.) (discussing the phrase "affecting a federally insured financial institution" in 12 U.S.C. § 1833, and citing to cases applying 18 U.S.C. § 3293).

In sum, the 2012 warrant was valid as both a civil and criminal seizure warrant pursuant to Sections 981(a)(1)(C) and 982(a)(2), and the funds in Wells Fargo -7984 were neither "untainted" nor "unlawfully" seized.   Accordingly, Lindell's motions are denied.

### B.   The Continued Retention Of Funds Is Lawful

Lindell argues that even if the Government's initial seizure of Wells Fargo -7984 was valid, Section 983(a)(3) precludes forfeiture and requires the return of the untainted funds because the Government missed the May 28, 2013 deadline for filing a civil forfeiture complaint.   Section 983 does nothing of the sort.

First, there can be no return of "untainted" funds because, as discussed above, Wells Fargo -7984 contains no such funds.   Second, Lindell is not entitled to the return of *any* funds based on the Government's election not to file a civil forfeiture complaint.   The Civil Asset Forfeiture Reform Act, Section 983 ("CAFRA"), creates a process by which a claimant can challenge the civil forfeiture of assets in which he or she has an interest.   CAFRA provides that when such a claim is made, as Lindell did here, a 90-day clock begins to run.   Under Section 983(a)(3)(B)—

> (B)   If the Government does not—
>
> > (i) file a complaint for forfeiture or return the property, in accordance with subparagraph (A); or
> >
> > (ii) before the time for filing a complaint has expired—

> > (I) obtain a criminal indictment containing an allegation that the property is subject to forfeiture; and
> >
> > (II) take the steps necessary to preserve its right to maintain custody of the property as provided in the applicable criminal forfeiture statute,
>
> the Government shall promptly release the property pursuant to regulations promulgated by the Attorney General, and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense.

*See also United States v. Martin*, 662 F.3d 301, 304 (4th Cir. 2011) ("Before the expiration of that [90-day] period, the government must do one of three things: (1) 'file a [civil] complaint for forfeiture,' (2) 'obtain a criminal indictment containing an allegation that the property is subject to forfeiture[ ] *and* take the steps necessary to preserve its right to maintain custody of the property as provided in the applicable criminal forfeiture statute,' or (3) 'return the property.'   18 U.S.C. § 983(a)(3)(B) (emphasis added).   If the government fails to complete one of these three steps before the 90 days expires, it is required to 'promptly release the property.'   *Id*.").

The indictment filed on May 23, 2013 – five days before the May 28, 2013 deadline – included a forfeiture allegation that the entire contents of Wells Fargo -7984 was subject to forfeiture pursuant to Section 981(a)(1)(C) and 28 U.S.C. § 2461 as proceeds traceable to the mail and wire fraud offenses, and Section

982(a)(1) as property involved in the money laundering offense charged.

Accordingly, the Government complied with Section 983(a)(3)(B)(ii)(I).[9]

Section 983(a)(3)(B)(ii)'s second prong requires the Government to take steps necessary to preserve its right to maintain custody of the funds as provided in 21 U.S.C. § 853, governing criminal forfeitures.[10]   The funds in Wells Fargo -7984 were seized pursuant to a civil and criminal seizure warrant and frozen in place at Wells Fargo, where they remain to date.   Thus, the Government took the steps necessary to maintain custody of the property under Section 983(a)(3)(B)(ii)(II). Because the Government complied with Section 983(a)(3)(B) by obtaining a criminal indictment and preserving its right to maintain custody of the property through the execution of the February 2012 seizure warrant, Lindell is not entitled to the release of any funds under that Section's so-called "death penalty" provision.

---

[9]The parties do not dispute that the Government has not filed a civil forfeiture complaint.

[10]Under Section 853(f)—

> (f)   Warrant of seizure
>
> The Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant.   If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that [a protective] order under subsection (e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

### C.    **Because Lindell's Funds Are Tainted, _Luis_ Is Not Applicable**

Lindell asserts that restraints on Wells Fargo -7984 violate his Sixth Amendment rights under the Supreme Court's recent decision in _Luis v. United States_, 136 S. Ct. 1083 (2016).   He seeks the release of those funds to hire counsel of his choice.   He also contends that his conviction must be vacated due to structural error.

_Luis_ held that the Government's pretrial restraint of untainted assets violates a defendant's Fifth and Sixth Amendment rights if it prevents the defendant from hiring counsel of his or her choice.   _Luis_ does not apply under the circumstances presented here because: (1) the funds at issue were not "untainted," and (2) the funds would not clearly have been available to Lindell to retain counsel in any event.

### 1.    _Luis v. United States_

In _Luis_, the defendant was charged with crimes related to healthcare fraud. 136 S. Ct. at 1087.   The Government alleged that Luis had fraudulently obtained nearly $45 million, much of which she had already spent.   In an effort to preserve the $2 million that remained, the Government sought, and the trial court issued, a pretrial order freezing those assets under 18 U.S.C § 1345(a)(2) "for payment of restitution and other criminal penalties."   _Id_. at 1088.   Both the prosecution and the defendant agreed that the freeze order would prevent the defendant from using her

own funds, not connected to the crime, to hire an attorney to represent her in the criminal case.   "Although the district court recognized that the order might prevent Luis from obtaining counsel of her choice, it held 'that there is no Sixth Amendment right to use untainted, substitute assets to hire counsel.'"   *Id.*

Luis appealed, arguing that the inability to use her own funds, untainted by the crime, was a violation of her Sixth Amendment right to hire counsel of her choice. The Eleventh Circuit, however, affirmed.   *Id.*   Disagreeing with the lower courts, the Supreme Court held that the "pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment."   *Id.* at 1088. The Court accordingly vacated the judgment of the Court of Appeals and remanded for further proceedings.   *Id.*

### 2.     *Luis* Is Not Applicable

Unlike in *Luis*, all of the funds at issue here are tainted.   The evidence at trial established that the funds in Wells Fargo -7984 were "involved in" and "traceable to" money laundering transactions that facilitated Defendants' perpetration of the charged mail and wire fraud offenses.   All of the investor funds that were deposited into BOH -3355, transferred to the TMS 401(k) during the operation of the Parking Lot scheme, and then rolled over into Wells Fargo -7984 were designed to conceal the origin of Lindell's criminal operation.   Lindell told investors that their funds

would be deposited into a separate Parking Lot account.   Instead, they were

commingled with TMS's operational funds in BOH -3355 where they lost their

identity – enabling Lindell to conceal the location of the funds and the primary

instrumentality of the Ponzi scheme.

Unlike the unquestionably "untainted" funds restrained in *Luis*, the

Government may "freeze, perhaps to seize, assets of the . . . 'tainted' kinds before

trial."   *Id.* at 1090.   *Luis* and the cases it relied upon "permit the Government to

freeze a defendant's assets pretrial, [and] the opinions in those cases highlight the

fact that the property was 'tainted,' *i.e.,* it did not belong entirely to the defendant."

*Id.* at 1094.   The restrained funds in *Luis* were "not connected with the crime," "not

connected to the indictment," and the parties, in fact, stipulated that they were

"untainted" as a matter of law and belonged "fully to the defendant."   *Id.* at

1087-88.   The relevant and material difference here is that Lindell's Wells Fargo

-7984 funds are tainted.   They do not belong to him in the manner that the untainted

funds at issue in *Luis* belonged to her.   Critically, "title to the property had passed

from the defendant to the Government before the court issued its order freezing (or

otherwise disposing of) the assets."   *Id.* at 1090 (discussing Section 853(c),

providing that the Government's ownership interest in property traceable to a crime

often passes to the Government upon the commission of the act giving rise to the

forfeiture); *id.* at 1092 ("[T]he Government even before trial had a 'substantial' interest in the tainted property sufficient to justify the property's pretrial restraint…Here, by contrast, the Government seeks to impose restrictions upon Luis' *un*tainted property without any showing of any equivalent government interest in that property.").

Moreover, notwithstanding the statements in Lindell's eleventh-hour Declarations (Dkt. Nos. 324 and 327), there is no indication of the amount of funds that would, in fact, be available, assuming they were untainted, nor is there an indication of whether that amount would be sufficient to hire "counsel of choice." For example, counsel for the bankruptcy trustee is clear that, had Lindell attempted to remove funds from Wells Fargo -7984 for the purpose of hiring private counsel, the trustee would have sought to garnish those funds in partial satisfaction of Lindell's $5,000,000 judgment.   *See* Ex. B to Govt.'s Collective Mem. in Opp. to Lindell Motions (Klevansky Decl. ¶ 11) (Dkt. No. 316) & Trustee's Limited Opp. at 4 ("[T]he Trustee gives notice that he reserves his claim to recover such funds in collection upon his Judgment, an issue not before this Court."); *see also Luis*, 136 S. Ct. at 1102 (Thomas, J., concurring) ("'A defendant may not insist on representation by an attorney he cannot afford.'") (quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988)).

Because *Luis* does not apply, Lindell is not entitled to the release of the tainted funds in Wells Fargo -7984 to hire counsel of his choice.   The motion for release of "untainted" funds (Dkt. No. 292) is denied.

### 3.   Lindell's Motion to Vacate Is Denied (Dkt. No. 294)

Lindell also seeks to vacate the jury's guilty verdict against him based on the Supreme Court's holding in *Luis*.   As with his prior motion, he contends that the seizure of Wells Fargo -7984 rendered him indigent, prevented him from hiring counsel of his choice, and resulted in a violation of his Sixth Amendment rights.[11] Lindell argues that this purported Sixth Amendment violation constituted structural error, requiring vacatur of the jury's verdict.

As discussed above, *Luis* provides no relief to Lindell.   He is not entitled to the release of the tainted funds in Wells Fargo -7984.   Consequently, he suffered no Sixth Amendment violation.[12]   The jury's verdict was not the result of structural

---

[11]*See* Lindell Decl. ¶ 3 ("After the government seized my retirement account and sent me a forfeiture notice, I could no longer afford to pay for an attorney.") (Dkt. No. 325).   As the Government notes in its Opposition, Lindell was more likely than not rendered indigent by the $5,000,000 stipulated bankruptcy judgment against him in 2011, rather than by the seizure of the $256,000 retirement account in 2012.   As of June 23, 2016, in excess of $2,000,000 remains owed on the stipulated judgment.   *See* Ex. B to Govt.'s Collective Mem. in Opp. to Lindell Motions (Klevansky Decl. ¶ 10) (Dkt. No. 316).

[12]Lindell was fully and fairly represented at trial by the Federal Public Defender, a full-time Federal Public Defender's office investigator, and a forensic accountant, who testified at trial that his fees for work on the case exceeded $50,000.   *See* 5/21/15 Tr. at 62 (Cross-Examination of Stephen Hironaka) (Dkt. No. 276).

error and will not be vacated.   Lindell's motion to vacate guilty verdicts (Dkt. No.

294) is denied.

### D.      Hoaeae's Joinder Is Denied (Dkt. No. 300)

Because the Court denies Lindell's motions (Dkt. Nos. 292 and 294),

Hoaeae's joinder in those motions is likewise denied.   Dkt. No. 300.

## II.      Motion To Unfreeze Asset For Livelihood Expenses (Dkt. No. 210)

In addition to seeking the release of the funds in Wells Fargo -7984 in order to

hire counsel, Lindell filed a motion requesting the release of funds from this same

account to pay "reasonable livelihood expenses for his two dependents."   The

motion, however, does not make a threshold showing itemizing or even describing

the necessary livelihood expenses incurred by Lindell's dependents.   Nor does the

motion contain any information on their assets, sources of income, or debts – beyond

a mere footnote referencing the termination of Social Security benefits upon

Lindell's conviction.   *See* Motion at 6 n.1 (Dkt. No. 210).   Such a threadbare

showing is insufficient to grant the relief requested, even assuming such a claim *on

behalf of dependents* is tenable.   *See United States v. Hantzis*, 2010 WL 4386761, at

*1 (9th Cir. Nov. 4, 2010) (Rejecting defendant's claim where "there was no

evidence that a fine would deprive him of his livelihood.").

28

Equally significant, at oral argument, the parties agreed that the disposition of this motion was controlled by the Court's determination of whether the funds in Wells Fargo -7984 were tainted and subject to forfeiture.   Lindell specifically conceded that this motion was premised on the underlying assumption that there are untainted funds in the account.   Because the funds in the account are, in fact, tainted, they are not subject to release.

The motion to unfreeze asset for livelihood expenses (Dkt. No. 210) is denied.

## III.   **Government's Motion for Entry of Forfeiture Money Judgment**

The Government seeks entry of the following forfeiture money judgments against Lindell and Hoaeae:

> (1) a personal money judgment against Defendants, jointly and severally, in the amount of $8,626,588.86, which reflects the amount of money that Defendants obtained, directly or indirectly, as a result of the mail fraud offenses charged in, *inter alia*, Counts 1, 3-4, and 6-10, and/or the wire fraud offenses charged in Counts 14 and 15; and

> (2) a personal money judgment against Defendant Lindell in the amount of $255,000, which reflects the amount of money involved in the money laundering offenses charged in, *inter alia*, Counts 17-20 of the Second Superseding Indictment.

### A.   **Standard**

Under Federal Rule of Criminal Procedure 32.2(b), the Government must establish, by a preponderance of the evidence, a nexus between the property to be

29

forfeited and the offense.   *United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1149 (9th Cir. 2011).   The Court must determine the amount of the judgment to be imposed as follows:

> (A) Forfeiture Determinations. As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute.   If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.   If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

> (B) Evidence and Hearing. The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable.   If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty.

Fed. R. Crim. P. 32.2(b)(1).   Once a defendant is convicted of the underlying crime that gives rise to the criminal forfeiture and the requisite nexus has been established, the imposition of the forfeiture is mandatory.   *United States v. Monsanto*, 491 U.S. 600, 607 (1989).

**B.**   **Entry of Personal Money Judgments**

    **1.**   **Proceeds From Mail And Wire Fraud Counts**

The Government seeks to forfeit all property derived from proceeds that Defendants obtained directly or indirectly as a result of the mail fraud scheme alleged in Counts 1, 3-4, and 6-10, and/or the wire fraud scheme alleged in Counts 14 and 15.   *See* 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (authorizing the criminal forfeiture of all property constituting or derived from proceeds traceable to a violation of "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)").   Section 1956(c)(7), in turn, defines the term "specified unlawful activity" to include all offenses listed in 18 U.S.C. § 1961(1), including mail fraud and wire fraud offenses in violation of 18 U.S.C. §§ 1341 and 1343.   *See also United States v. Vampire Nation*, 451 F.3d 189, 200 (3d Cir. 2006) (Section 2461 permits criminal forfeiture for general mail fraud, "not just mail fraud against financial institutions.").   As "specified unlawful activities," all real and personal property constituting or derived from the proceeds, obtained directly or indirectly by their violation, are subject to forfeiture to the United States.   *See* 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461.

"Proceeds" as used in Section 981(a)(1)(C) includes "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving

31

rise to forfeiture, and any property traceable thereto, and is not limited to the net gain

or profit realized from the offense."   28 U.S.C. § 981(a)(2)(A); *see also United*

*States v. Venturella,* 585 F.3d 1013, 1015 (7th Cir. 2009) (forfeiture "is not limited

to the amount of the particular mailing but extends to the entire scheme").

Forfeiture is not limited to the specific amounts alleged in an indictment.   *See id.* at

1017 ("[T]he plain language of section 981(a)(1)(C) along with the expansive

definition of 'proceeds' indicates that the statute contemplates the forfeiture of

property other than the amounts alleged in the count(s) of conviction."); *United*

*States v. Ventura-Oliver*, 2014 WL 2712294, at *3 (D. Haw. June 13, 2014).

The Government has presented ample evidence establishing by a

preponderance that the proceeds from the Parking Lot were at least $8,626,588.86.

In particular, the Government presented evidence that Defendants took in gross

receipts of over $26 million in deposits from Parking Lot investors and that the net

loss to victims was $8,988,428.47.   *See* Trial Ex. O-7.

Although Defendants do not contest that forfeiture is mandatory, they request

that the amount of any money judgment be offset by the amount of any seized assets,

including the $27,000 that the jury found subject to forfeiture.   The Government

does not dispute that Defendants are entitled to credit against the money judgment

any seized funds *actually* forfeited.   *See Ventura-Oliver*, 2014 WL 2712294, at *3.

Lindell also asserts that the initial calculation of net losses should be limited to the 62 individuals who responded to the Probation Office's Victim Notices and Questionnaires, for a total loss of $4,587,00.81.   There is no legal basis for this assertion.   Defendants are jointly and severally liable for the gross proceeds of the entire fraudulent scheme.   *See United States v. Boulware,* 384 F.3d 794, 813 (9th Cir. 2004); *United States v. Hamaker,* 455 F.3d 1316 (11th Cir. 2006) (amount of forfeiture is dependent on the amounts of gross proceeds of the crime, not the loss to victims).   Victim loss is not material to this determination, much less loss limited to and measured by questionnaires returned to Probation.

To the extent Lindell objects to the amount of the money judgment as excessive and in violation of his Eighth Amendment rights, the Court notes that the amount sought by the Government is substantially less than the $26 million in gross receipts taken in by the Parking Lot scheme.   Moreover, the forfeiture money judgment sought is not grossly disproportionate to the gravity of Lindell's offense. *See United States v. Ladum*, 141 F.3d 1328, 1348 (9th Cir. 1998); *United States v. Newman*, 659 F. 3d 1235, 1241 (9th Cir. 2011).

Based on the evidence presented at trial, the Government has established, by a preponderance of the evidence, that Defendants obtained more than $8,626,588.86 as a result of the scheme to defraud underlying Defendants' mail and wire fraud

33

convictions on Counts 1, 3-4, 6-10, and 14-15.   Because $8,626,588.86 constitutes

funds that Defendants obtained, directly or indirectly, as a result of the mail and wire

fraud scheme, that amount is subject to forfeiture under Section 981(a)(1)(C), and

the Government is entitled to a personal money judgment against Lindell and

Hoaeae, jointly and severally, in that amount.

## 2.   Proceeds From Money Laundering

Real and personal property involved in money laundering violations under

Section 1957 are subject to forfeiture.   18 U.S.C. § 982(a)(1).   "Property involved"

in the offense extends to the money or property being laundered and any property

used to facilitate the laundering offense.   *United States v. Huber*, 404 F.3d 1047,

1056 (8th Cir. 2005).   The jury found Lindell guilty of the money laundering

offenses set forth in Counts 17-20 of the Second Superseding Indictment.   The four

transactions underlying those counts totaled $255,000: (1) Count 17 ($50,000); (2)

Count 18 ($70,000); (3) Count 19 ($85,000); and (4) Count 20 ($50,000).   FBI

Forensic Accountant Laurice Otsuka described each of the underlying monetary

transactions during her testimony, including her analysis that each transaction

involved more than $10,000 in funds derived by Lindell from the Parking Lot

scheme.

Accordingly, based on the evidence presented at trial, the Government has established, by a preponderance of the evidence, that it is entitled to the imposition of a forfeiture money judgment against Lindell only in the amount of $255,000, which represents the sum total of funds that were involved in the money laundering offenses for which he was convicted.

The Government's motion is granted.   The Court directs the Government to submit an appropriate order of forfeiture for the Court's approval.

## IV.   Government's Application for Restraining Order, Or In The Alternative, A Seizure Warrant (Dkt. No. 311)

The Government seeks a restraining order pursuant to the All Writs Act, 28 U.S.C. § 1651(a), to prevent Lindell from dissipating funds in Wells Fargo -7984. Alternatively, it seeks a seizure warrant to be served upon Wells Fargo with the request that the funds continue to be held in place, to the extent the existing warrant does not cover funds in excess of the $256,688.46 initially seized.   Because the Court has found Wells Fargo -7984 to contain "tainted" funds that are not subject to release absent court order, the Government's application for a further seizure

warrant relating to that account is unnecessary and is denied as moot.[13]   Dkt. No.

311.

## **CONCLUSION**

For the foregoing reasons, the following motions are DENIED: Lindell's

Motion to Partially Unfreeze Asset for Livelihood Expenses (Dkt. No. 210);

Lindell's Motion for Immediate Return of Untainted Portion of Seized Asset (Dkt.

No. 292); Lindell's Motion to Vacate Guilty Verdicts (Dkt. No. 294); and Hoaeae's

Joinder in Lindell's Motions Dkt. Nos. 292, 294 (Dkt. No. 300).

The Government's Application for a Restraining Order, Or in the Alternative,

A Seizure Warrant (Dkt. No. 311) is DENIED AS MOOT.

///


///


///

---

[13]According to Government counsel at oral argument, the Government's Application would also
be moot upon entry of the forfeiture money judgment requested by the Government.   Since the
Court is ordering that entry as part of this Order, even the Government does not appear to dispute
the mootness of its Application.

The Government's Motion For Entry Of Forfeiture Money Judgment (Dkt. No. 214) is GRANTED.   The Government is directed to submit an appropriate order of forfeiture for the Court's approval by no later than **September 12, 2016**.

IT IS SO ORDERED.

DATED: September 8, 2016 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

*United States v. Lindell, et al.*; CR 13-00512 DKW; **ORDER (1) DENYING LINDELL'S MOTION TO PARTIALLY UNFREEZE ASSET FOR LIVELIHOOD EXPENSES (DKT. NO. 210); LINDELL'S MOTION FOR IMMEDIATE RETURN OF UNTAINTED PORTION OF SEIZED ASSET (DKT. NO. 292); LINDELL'S MOTION TO VACATE GUILTY VERDICTS (DKT. NO. 294); AND HOAEAE'S JOINDER IN LINDELL'S MOTIONS (DKT. NO. 300); (2) DENYING AS MOOT GOVERNMENT'S APPLICATION FOR A RESTRAINING ORDER, OR IN THE ALTERNATIVE, A SEIZURE WARRANT (DKT. NO. 311); AND (3) GRANTING GOVERNMENT'S MOTION FOR ENTRY OF FORFEITURE MONEY JUDGMENT (DKT. NO. 214)**