UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| GEORGE LINDELL,<br><br>            Petitioner,<br><br>    vs.<br><br>UNITED STATES OF AMERICA,<br><br>            Respondent. | CR. NO. 13-00512-1 DKW<br>CV. NO. 20-00352 DKW-WRP<br><br>**ORDER (1) DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE; AND (2) DENYING CERTIFICATE OF APPEALABILITY** |

| | |
|---|---|
| HOLLY HOAEAE,<br><br>            Petitioner,<br><br>    vs.<br><br>UNITED STATES OF AMERICA,<br><br>            Respondent. | CR. NO. 13-00512-2 DKW<br>CV. NO. 20-00353 DKW-WRP<br><br>**ORDER (1) DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE; AND (2) DENYING CERTIFICATE OF APPEALABILITY** |

In almost identical fashions, Petitioners George Lindell and Holly Hoaeae move pursuant to Section 2255 of Title 28 to vacate their sentences for mail and wire fraud and, additionally, with respect to Lindell, for money laundering, alleging a catalogue of instances of ineffective assistance of various counsel.

Defendants, however, fail to establish that their counsels' performance was deficient in any of the circumstances they identify.  Further, the evidence presented at their weeks-long jury trial conclusively established their guilt, and, thus, they have failed to show any prejudice from their counsels' performance, even if deficient.   Therefore, as more fully discussed below, Defendants have failed to show an entitlement to relief under Section 2255.

## BACKGROUND

### I.   Indictment

On October 23, 2014, a grand jury returned a Second Superseding Indictment (SSI) in this case, charging Lindell and Hoaeae together with 12 counts of mail fraud and 3 counts of wire fraud, as well as charging Lindell individually with 5 counts of money laundering.  Dkt. No. 60.  The SSI also provided notice that, upon conviction, Lindell and Hoaeae would forfeit $27,000 contained in a Wells Fargo IRA account in the name of Lindell and $8,626,588.86, which represented the total proceeds of the charged mail and wire fraud offenses.

### II.   Trial

On April 22, 2015, a jury began hearing evidence in a trial that would last five weeks.  At the conclusion of that trial, the jury returned guilty verdicts against Lindell and Hoaeae on eight counts of mail fraud and two counts of wire fraud, and

against Lindell on four counts of money laundering.  Dkt. Nos. 200-201.[1]  Further, the jury found that $27,000 in Lindell's Wells Fargo IRA account was obtained from the mail and wire fraud offenses as to which he was found guilty.  Dkt. No. 204.

In support of the jury's verdicts, the evidence at trial showed the following. Lindell and Hoaeae owned or controlled companies known as The Mortgage Store (TMS) and True Wealth Group, LLC, Living by Design (TWG).  4/23/15 Trial Transcript at 34:23-38:16, Dkt. No. 259.  Through TMS, from at least 2005 to 2010, Lindell and Hoaeae marketed a product called "The Parking Lot" (PL), where investors could safely "park" their money at guaranteed rates of return ranging from 6 to 8 percent.  *Id.* at 38:17-40:5; 4/27/15 Trial Transcript at 91:21-25, Dkt. No. 261; 4/28/15 Trial Transcript at 14:23-15:1, 90:7-19, Dkt. No. 262; 4/29/15 Trial Transcript at 13:21-14:16, Dkt. No. 263; 5/4/15 Trial Transcript at 12:23-13:2, 82:4-19, 83:4-18, 83:24-84:16, Dkt. No. 265; 5/6/15 Trial Transcript at 79:10-23, Dkt. No. 267; 5/8/15 Trial Transcript at 63:18-64:1,129:25-130:12, 131:2-13, Dkt. No. 269; 5/11/15 Trial Transcript at 41:7-17, 47:19-22, 154:1-4, 155:1-3, Dkt. No. 270; 5/12/15 Trial Transcript at 14:15-22, Dkt. No. 271.  TMS documented Parking Lot investments by issuing a promissory note setting forth the

---

[1]Prior to the close of evidence, the government had moved to dismiss four counts of mail fraud, one count of wire fraud, and one count of money laundering, which the Court granted.

amount of an investment, the interest rate to be paid, and that an investor could demand their money back within five days. 4/23/15 Tr. at 40:20-42:14.

Lindell and Hoaeae represented to potential PL investors that their funds would be deposited in a separate account and invested in bonds and secured real estate. *Id*. at 120:14-22; 4/24/15 Trial Transcript at 103:14-104:9, Dkt. No. 260; 4/27/15 Tr. at 12:6-13:20; 4/28/15 Tr. at 90:25-91:18; 4/30/15 Trial Transcript at 14:11-17:15, 61:25-62:10, 62:19-63:21, Dkt. No. 264; 5/4/15 Tr. at 14:5-25; 5/8/15 Tr. at 130:8-12, 5/11/15 Tr. at 47:25-48:6, 48:21-49:3, 155:12-13; 5/12/15 Tr. at 15:9-12. Instead, Lindell and Hoaeae used deposited funds to make payments to earlier investors and themselves and invest in "high risk" junk bonds. 5/12/15 Tr. at 84:14-85:4, 86:21-87:1, 87:22-88:3, 92:17-93:6, 94:13-97:9, 98:6-99:6, 102:24-103:24, 110:4-112:22; 5/13/15 Trial Transcript at 148:24-149:11, 156:10-160:9, Dkt. No. 272; 5/14/15 Trial Transcript at 18:12-24, 19:9-25:5, 30:5-31:1, Dkt. No. 273. They also deposited PL funds into TMS' business bank account (ending in 355), rather than in separate investor accounts. 4/23/15 Tr. at 43:17-44:2; 5/13/15 Tr. at 157:4-6; 5/14/15 Tr. at 32:5-17.

The result of depositing PL funds into TMS' bank account was to immediately commingle PL and non-PL funds, making tracing of the former more difficult. 4/23/15 Tr. at 44:3-45:17. In an effort to unravel the commingling of funds in the TMS bank account, the government's expert in forensic accounting,

4

Laurice Otsuka, applied an accounting methodology known as the "lowest intermediate balance rule" or "LIBR." *Id*. at 46:9-17.  Otsuka identified 166 individuals who invested in the Parking Lot, with their investments totaling $26.6 million.  5/13/15 Tr. at 128:18-22, 129:1-4.  From 2005 to 2010, 51.4 percent of the funds going into TMS' bank account were PL investments.  *Id*. at 134:18-22.  Applying the LIBR methodology, Otsuka determined that the "number one" use of PL funds was to make PL payments to other investors in the amount of $11.7 million.  *Id*. at 141:19-142:13, 144:9-145:20.  Also, during this time, both Lindell and Hoaeae withdrew money from the TMS bank account, *id*. at 136:9-137:15, with Otsuka calculating that Lindell received $1.8 million and Hoaeae $666,000 from PL investors, *id*. at 146:22-147:4, 147:13-17.  Lindell and Hoaeae used PL funds to pay personal expenses, such as credit card payments and travel, and for construction of Lindell's residence.  *Id*. at 155:5-10, 156:5-160:9; 5/14/15 Tr. at 11:11-13, 17:1-3, 18:8-19, 19:9-11, 20:17-20, 21:10-15.  Among other things, on at least four occasions, Lindell transferred more than $10,000 of PL funds from TMS' bank account to an account in his own name or for his own purposes.  5/14/15 Tr. at 56:13-59:11.  In addition, $27,000 of PL funds were deposited into Lindell's personal retirement account.  *Id*. at 28:3-31:3.  Otsuka also determined that only 59% of PL funds were invested in bonds, real estate, or private lending.  5/22/15 Trial Transcript at 59:11-22, Dkt. No. 279.

5

In connection with the Parking Lot, Lindell and Hoaeae mailed financial statements, checks, and tax forms to investors.  4/23/15 Tr. at 138:17-140:2; 4/28/15 Trial Transcript at 109:22-110:7, Dkt. No. 262; 4/30/15 Tr. at 107:10-17; 5/6/15 Tr. at 49:8-16, 91:25-92:14.  Lindell and Hoaeae also received funds from, and sent funds to, investors via wire transfer.  5/8/15 Tr. at 145:4-147:17; 5/13/15 Tr. at 53:22-54:13.

In September 2010, Lindell decided to "close down" the Parking Lot. 5/19/15 Trial Transcript at 38:18-22, Dkt. No. 276.  Two months later, TMS filed for bankruptcy protection.  *Id*. at 42:21-43:4.  Of the 166 investors in the Parking Lot, 108 incurred losses on their investments, with some of the individual losses ranging from $103,887 to $550,700 and the total loss equaling $8,988,428.47. 5/14/15 Tr. at 35:15-17, 36:13-20, 37:2-39:23.

### III.   Post-Trial

After the jury verdicts, but prior to sentencing, trial counsel for Lindell, Peter Wolff, and Hoaeae, Stuart Fujioka, moved to withdraw as counsel.  Dkt. Nos. 209, 220.  Those motions were both granted, Dkt. Nos. 218, 227, with Lynn Panagakos and Cynthia Kagiwada subsequently being appointed to represent Lindell and Hoaeae, respectively, Dkt. Nos. 228, 237.  On August 21, 2015, the government moved for entry of two forfeiture money judgments in the amount of (1) $8,626,588.86 against Lindell and Hoaeae, and (2) $255,000.00 against Lindell.

Dkt. No. 214.  Subsequently, Lindell moved to vacate his guilty verdicts on the ground that the seizure of his retirement account deprived him of his right to hire counsel of his choice.  Dkt. No. 294.  On September 8, 2016, the Court granted the government's motion for entry of forfeiture money judgments and denied Lindell's motion to vacate the guilty verdicts in this case.  Dkt. No. 338.

A week later, the Court sentenced Lindell and Hoaeae to terms of imprisonment of 210 months and 120 months, respectively.  Dkt. Nos. 354-355.  In fashioning a sentence for Lindell, the Court observed that the Parking Lot was based upon false promises of a secure and guaranteed investment return that was critical to the decisions made by individuals to invest.  9/15/16 Sentencing Transcript at 51:17-52:7, Dkt. No. 385.  In contrast to those promises, Lindell instead invested in, among other things, high-risk junk bonds in an attempt to achieve the 6 to 8 percent return promised to investors, while continuing to represent that the value of the bond portfolio was, at times, 10 times more than what was true.  *Id*. at 52:7-53:9.  Lindell also used PL funds to invest in himself, "lin[ing]" his own pockets by taking numerous trips around the world, principally for hunting, and buying a multi-million-dollar home in Lahaina.  *Id*. at 55:16-56:5.  Even up to the very end of the Parking Lot in 2010, Lindell continued to accept significant amounts of money from investors, despite knowing that "the gig was up."  *Id*. at 53:10-21.

## IV.    <u>Appeal</u>

Both Lindell and Hoaeae appealed.  On April 1, 2019, the Ninth Circuit affirmed their convictions.  Dkt. No. 399.  In doing so, the Ninth Circuit rejected Lindell and Hoaeae's arguments that the government impermissibly withheld funds to pay for counsel of their choice, that the jury instructions constructively amended the indictment, that the Court improperly admitted evidence of their sales of unlicensed securities, that the Court erred in allowing a witness, Keith Cunningham, to testify as a fact witness, and that the Court erred in sentencing Hoaeae.

## V.    <u>This Section 2255 Proceeding</u>

On August 14, 2020, proceeding pro se, Lindell and Hoaeae both filed separate, but largely identical, motions to vacate, set aside, or correct their sentences (collectively, "the Section 2255 Motions," and, individually, "the Lindell Section 2255 Motion" and "the Hoaeae Section 2255 Motion," respectively).  Dkt. Nos. 429-430.[2]  Therein, Lindell and Hoaeae delineate 12 numbered claims for relief, each of which contain numerous sub-arguments.  Those substantive claims are identical, even to the extent that Hoaeae's Section 2255 Motion references Lindell's trial counsel and Lindell's medical conditions as reasons for relief.

---

[2]When citing to specific pages of the Section 2255 Motions, the Court cites to the page numbers assigned to the motions by CM/ECF at the top of each page, as no other page numbering exists for the claims asserted in the motions.

On December 4, 2020, the government filed a consolidated opposition to the Section 2255 Motions.  Dkt. No. 465.  Although a deadline of January 15, 2021 was set for Lindell and Hoaeae to file a reply, Dkt. No. 459, as of the date of this Order, no reply has been filed by either petitioner.

## STANDARD OF REVIEW

Under Section 2255 of Title 28 of the United States Code (Section 2255), "[a] prisoner in custody under sentence of a court established by Act of Congress…may move the court which imposed the sentence to vacate, set aside, or correct the sentence."  28 U.S.C. § 2255(a).  The statute authorizes the sentencing court to grant relief if it concludes "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"  *Id.*

## DISCUSSION

As an initial matter, for all relevant purposes, the Section 2255 Motions are identical, even though two *individual* defendants seek to have their convictions overturned based upon the alleged ineffective assistance of their *separate* counsel. The arguments presented therefore only go so far, at least as they pertain to Hoaeae who appears to have adopted all of Lindell's arguments--even those that mention Wolff, Lindell's trial counsel, by name.  In this light, although Hoaeae's pro se

Section 2255 Motion is liberally construed, the Court cannot simply substitute her trial counsel's name, Stuart Fujioka, wherever Lindell's trial counsel, Peter Wolff, is alleged to have done (or not done) certain things.  Instead, the Court addresses the claims of ineffective assistance of counsel in the Section 2255 Motions as one, noting where possible any potential applicability to Hoaeae.

1.    **Claim One**

In Claim One, as in all but one instance of the Section 2255 Motions, Lindell claims the alleged ineffective assistance of counsel.

To prevail on an ineffective assistance of counsel claim, a petitioner must establish two distinct elements.  First, he must show that counsel's representation fell below an objective standard of reasonableness.  *Strickland v. Washington,* 466 U.S. 668, 688 (1984).  Second, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  In other words, a petitioner must show both that counsel's performance was deficient *and* that the deficiency was prejudicial.  *Id*. at 692.

Counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 690-691.

Conclusory allegations of ineffective assistance of counsel made with no factual or legal explanation fall well short of stating a cognizable claim for ineffective assistance of counsel.  *See Blackledge v. Allison,* 431 U.S. 63, 74 (1977) ("[P]resentation of conclusory allegations unsupported by specifics is subject to summary dismissal.").

Because it is relevant to all of the claims of ineffective assistance of counsel, whether made by Lindell or Hoaeae, the Court begins with prejudice.  As the Court described at sentencing, the evidence in this case was overwhelming.  It conclusively showed that Lindell and Hoaeae deceived more than a hundred investors into handing over their money−in most cases, significant, life-altering sums of money−so that Lindell and Hoaeae could "line" their own pockets.  They did this by promising investors that their money would be safe, while investing the same in high-risk junk bonds or not at all, and while using new investment monies to pay both themselves and earlier investors.  Further, they did so by use of the mail, wires, and, in Lindell's case, money laundering.  Put simply, Lindell and

Hoaeae told each and every one of their clients one thing to obtain their investments, did something different with those investments, and, during the time period of the scheme, profited from it personally. This amounted to a scheme to defraud, and there was little legitimate defense that could have been mustered to prevent the onslaught of incriminating investor and other testimony and physical evidence from resulting in guilty verdicts for the crimes charged. Thus, the Court has no doubt in finding that, even if counsel performed deficiently in this case, the result of neither Lindell nor Hoaeae's trial would have been different. This is reinforced by each of the specific claims they raise, as discussed in turn below.

In his first claim, Lindell argues that his trial counsel failed to create a "comprehensive defense strategy" demonstrating his factual innocence, including by failing to present evidence of the same. Dkt. No. 429 at 13; *see also* Dkt. No. 430 at 13. Lindell, however, does not provide, or identify, any part of the missing defense strategy or any of the allegedly innocent-proving evidence. Instead, he simply proceeds to challenge categories of evidence presented at trial and argue that, in his opinion, such evidence has an innocent or "correct[]" explanation. Such "evidence-based" arguments, however, are "not cognizable under [Section] 2255." *United States v. Berry*, 624 F.3d 1031, 1038 (9th Cir. 2010).[3]  Moreover,

---

[3]In part, Lindell also relies upon his own trial testimony as supporting the alleged innocence of his actions. Dkt. No. 429 at 13. This habeas proceeding is not the time, though, to argue over the strength of trial testimony, which, in light of the jury's verdicts against Lindell, the jury

even if these arguments had been raised on direct appeal, where, if anywhere, they should have been, as discussed, no prejudice befalls Lindell from the failure to do so in light of the evidence supporting his convictions. Finally, also in this claim, Lindell argues that, to his "amazement," Wolff told the jury that Lindell would prove his own innocence. Dkt. No. 429 at 14. As the government explains, however, Wolff did no such thing. *See* Dkt. No. 465 at 43.

Accordingly, Claim One is denied.

## 2.      **Claim Two**

In his second claim, Lindell argues that Wolff came unprepared for trial because he had little or no understanding of LIBR and failed to research why the LIBR method should not have been allowed at trial. While, nominally, Lindell frames this claim as an attack on his trial counsel, it is actually an attack on the LIBR method itself relied upon by the government to untangle the investor funds that Lindell commingled in TMS' business account. Regardless, the claim as framed is meritless.

As this Court has already explained in this case, LIBR is an accepted method of tracing commingled or tainted funds. 9/8/16 Order at 14-15 & n.7, Dkt. No. 338. While Lindell contends that LIBR is "not considered an accepted accounting

---

clearly construed against him. *Cf. United States v. Hodges*, 770 F.2d 1475, 1478 (9th Cir. 1985) ("questions of credibility are for the jury to decide and are generally immune from appellate review.").

method in the operations of a business[,]" Dkt. No. 429 at 16, it is an acceptable method to *trace* funds that have been commingled. Moreover, Lindell's line of attack on the LIBR tracing method is something his counsel elicited at trial. *See* 4/23/15 Tr. at 87:5-9. Thus, he cannot claim any deficient performance in this regard.

Elsewhere in this claim, Lindell attempts to recharacterize many of the transactions he undertook after accepting money from investors. For example, he describes paying old investors with new investors' money as "a normal refinance transaction[,]" and building his home with investors' money as "investments[.]" Dkt. No. 429 at 16. Lindell's characterizations, however, are irrelevant to whether evidence supported his convictions. As discussed, and as Lindell tacitly acknowledges, he used investors' money to pay-off other investors and to pay his own personal expenses, all while telling those same investors that their money was being placed in safe investments that had nowhere near the value he ascribed to them.

In this claim, Lindell also argues that there was insufficient evidence of his intent to defraud because he gave more money to TMS than he took out. The evidence at trial, however, reflects otherwise. *See* 5/12/15 Tr. at 104:3-17, 135:25-137:7. Moreover, the fact that other people, notably persons charged with overseeing TMS' bankruptcy, *after-the-fact*, obtained money from Lindell in order

14

to partially satisfy the funds he had lost for investors, is entirely irrelevant to his intent while the scheme to defraud was taking place.

Accordingly, Claim Two is denied.

**3.      Claim Three**

In his third claim, Lindell lists still more issues with the trial evidence that he claims should have been handled differently by Wolff to demonstrate his innocence.  Lindell's primary source of contention here is with government witness Russ Murakami's testimony.  Lindell argues that Murakami, who testified in part about when he considered TMS to be insolvent, made "disputable" adjustments to TMS' balance sheets and improperly calculated TMS' assets and liabilities.  Wolff, however, cross-examined Murakami on his failure to make a "fair value" determination of TMS' assets, his failure to consider Lindell's history of repaying money he withdrew from TMS' bank account, and the recovery in the market value of TMS' bond investments.  *See* 5/12/15 Tr. at 137:8-20, 141:2-142:5, 144:12-20.  In light of this cross-examination, Lindell provides no explanation as to how anything else he discusses in this claim would have materially altered the testimony from Murakami.  Moreover, the issue of when TMS became insolvent has little bearing on the lies Lindell told his clients before they decided to invest in the Parking Lot or on the money from those clients that he

used for his own personal benefit.  Therefore, Lindell cannot establish prejudice in this regard.[4]

Accordingly, Claim Three is denied.

### 4.    **Claim Four**

In his fourth claim, Lindell yet again attempts to re-argue the import and meaning of evidence.  On this occasion, Lindell argues that a financial summary that he personally prepared demonstrates his innocence, as the Parking Lot made a profit and "almost all" funds were invested "at all times."  Dkt. No. 429 at 20.  As Lindell puts it, "[m]y background would suggest that I may know what I am talking about yet Mr. Wolff did not adequately investigate the available financial reports, that if understood and verified, could have changed the outcome of the trial."  *Id.*

The evidence at trial, however, did not show that "almost all" funds from Lindell's clients were invested at all times or that the Parking Lot made a profit. Rather, the evidence showed that, at most, 67% of PL funds were invested in

---

[4]In this claim, Lindell also contends that Murakami's report "disproves" various "elements" of the offenses charged in the indictment.  Although it is not clear to what "elements" Lindell refers, it appears that he is concerned with general background allegations in the indictment, rather than the actual elements of wire/mail fraud or money laundering.  *See* Dkt. No. 429 at 18. In this claim, Lindell also states that an "essential feature" of a Ponzi scheme was missing here, and this missing feature can be "verified by expert witness testimony similar to [Stephen] Hironaka's testimony."  *Id.*  Wolff, however, presented Hironaka's testimony to the jury, and, thus, he was not deficient in this regard.

bonds, real estate, or private lending.  5/22/15 Tr. at 59:11-22.[5]  Further, the

evidence reflected that investors in the Parking Lot lost, in total, nearly $9 million.

5/14/15 Tr. at 39:16-17.  Lindell testified at length at trial and thus had ample

opportunity to present his take on what the financials showed.  The jury simply and

quite clearly did not believe him and instead chose to credit the significant

evidence to the contrary.

Lindell also argues that Wolff should have retained a certified public

accountant (CPA) to support his beliefs that the Parking Lot was profitable and

almost fully invested.  Other than his self-created summary, though, Lindell

provides no explanation as to how a CPA could give such testimony.  Moreover,

Lindell also fails to explain how any such testimony would disturb the

conclusively established facts that he lied to his clients, he used their money for his

own personal purposes (without telling them), and his clients lost nearly $9

million.

Accordingly, Claim Four is denied.

**5.   Claims Five and Eleven**

In his fifth and eleventh claims, Lindell argues that Wolff performed

deficiently in failing to adequately investigate the seizure of his retirement account

and failing to submit evidence that the account was untainted or that he would have

---

[5]The Court notes that Otsuka put the number at 59%.

used the account to pay for counsel of his choice.  As the government asserts, however, the propriety of the seizure of Lindell's retirement account has already been litigated before this Court and the Ninth Circuit Court of Appeals on direct appeal.  *See* Dkt. No. 465 at 49-50.  Recasting this issue in the guise of ineffective assistance does little to alter the Court's earlier analysis.

Lindell faults Wolff for filing a motion seeking the release of his retirement account on the basis of needing the funds therein to support his family, even though Lindell acknowledges that was the only reason he had provided Wolff for needing the same.  *See* Dkt. No. 429 at 21.  The remaining purported examples of ineffective assistance all concern Lindell's opinion of the evidence supporting the seizure of the retirement account.  As this Court explained more than four years ago, the initial seizure and retention of funds from Lindell's retirement account was lawful.  *See* Dkt. No. 338 at 10-22.  Therefore, contrary to Lindell's assertion, he could not use the account to hire a lawyer of his choice.  Further, Lindell's continued contention that reports from Murakami and Otsuka *support* his arguments is belied by their clear testimony at trial that Lindell and Hoaeae were accessing TMS' bank account as if it was their own and $27,000 of PL funds were transferred to Lindell's retirement account.  5/12/15 Tr. at 94:17-23; 5/14/15 Tr. at 30:5-18.  Finally, even if Lindell had access to the money in his retirement account and even if he hired his own counsel, he presents no explanation how the jury's

verdicts in this case would have been any different with such counsel. Therefore, he again cannot show prejudice.

Accordingly, Claim Five and Claim Eleven are denied.

**6.  Claim Six**

In his sixth claim, in addition to yet again asserting that various evidence proves his innocence, Lindell also argues that Wolff performed deficiently in cross-examining Keith Cunningham. Specifically, Lindell argues that Wolff should have challenged Cunningham's statements that the Parking Lot was a Ponzi scheme and did not generate enough income. Lindell, however, mischaracterizes Cunningham's testimony as well as the related evidence in the record.

At trial, Cunningham testified that, after reviewing financial information for TMS that Lindell had provided Cunningham for a business seminar, he was "alarmed" with the PL scheme because, at that time, $12 million had been borrowed from investors with a guaranteed rate of interest of 7%, even though there was no indication in the information provided that there was sufficient income from the Parking Lot's investments to cover the guaranteed return. 5/7/15 Trial Transcript at 24:14-25:6, Dkt. No. 268. Cunningham further testified that he told Lindell that, if PL investors wanted their money back at the same time, as was their right, the only way he would be able to comply would be to raise money from other investors, which Cunningham described as a "Ponzi scheme." *Id*. at 26:6-10.

19

None of the arguments in this claim undermine Cunningham's testimony. While Lindell asserts that for three quarters of 2008, the Parking Lot allegedly made a profit, even if true, that does not disturb Cunningham's statement that the Parking Lot did not generate enough income to pay the rate of interest guaranteed to investors. Indeed, Lindell points to no evidence showing that investors ever received all of the interest they were guaranteed. Nor is there any evidence undermining Cunningham's statement that, if PL investors wanted their money back at the same time, Lindell would only be able to satisfy this demand by raising new money. In fact, the evidence at trial supported this statement. *See* 5/13/15 Tr. at 144:19-145:20, 149:2-11 (Otsuka testifying that $11.7 million of PL money was used to pay PL investors). As such, Wolff did not perform deficiently in this regard.

Elsewhere in this claim, Lindell argues that Wolff should have made certain arguments indicating a lack of intent to defraud investors. Wolff, however, did make this argument. In closing, Wolff argued that a person trying to defraud investors would not have provided Cunningham with financial information about the Parking Lot. 5/26 Trial Transcript at 112:11-15, Dkt. No. 280. As for any other arguments Wolff could have made, Lindell provides no explanation as to why Wolff was deficient in failing to make them and makes no argument that they would have changed the verdicts in this case. The Court also rejects Lindell's

contention that Cunningham's testimony somehow "prejudiced" the jury and/or this Court at sentencing, given the conclusive evidence of guilt, even absent Cunningham's testimony.[6]

Accordingly, Claim Six is denied.

7. **Claims Seven and Ten**

In his seventh claim, Lindell argues that Wolff failed to adequately understand and plan a defense for the securities violations alleged in the indictment. Lindell also lists a series of questions that Wolff should have asked at trial. In his tenth claim, Lindell argues that Wolff failed to inform him, prior to Lindell rejecting a plea offer, that he could be convicted of uncharged securities violations.

The principal problem with the arguments in these claims is that they are premised upon Lindell's incorrect belief that he was convicted of securities violations. That is simply not what happened. First, Lindell and Hoaeae were convicted of mail and wire fraud. Second, at trial, the government offered

---

[6]At the end of this claim, Lindell also argues that a "sweep" account and certain loans should have been considered to be investments. Dkt. No. 429 at 24. While these arguments appear unrelated to the arguments concerning Cunningham's testimony, the Court notes that they are meritless. Among other things, Lindell provides no explanation why the "sweep" account should be considered an investment, given that the purpose of such an account is to earn a "small amount of interest" overnight before money is transferred back into a business' checking account. *See* 4/23/15 Tr. at 44:25-45:10. Lindell also fails to address the trial testimony from Murakami explaining why the so-called "loans" to Lindell and Hoaeae were not treated as investments–namely, the lack of evidence that the "loans" would ever be repaid. *See* 5/12/15 Tr. at 94:13-99:25, 101:10-103:1.

evidence that the promissory notes Lindell gave to investors should have been registered as securities in order to *support* the charges of mail and wire fraud. Third, this evidence supported the charged offenses because, if the promissory notes had been registered, Lindell would have been required to make public disclosures that he did not. *See* 5/6/15 Tr. at 30:2-22. The premise of Lindell's arguments in these claims−that he was convicted of a "different scheme" to defraud than the one with which he was charged−is, therefore, misplaced. Equally misplaced and speculative are Lindell's ruminations on whether the jury was confused simply because he was confused. *See* Dkt. No. 429 at 25 ("Since we were confused, it is possible that some jurors were also.").[7]

Accordingly, Claim Seven and Claim Ten are denied.

## 8.   Claim Eight

In his eighth claim, Lindell makes two lines of argument. First, in about a page and a half of single-spaced writing, he argues that Wolff failed to fully disclose how Lindell was pressured into signing a settlement agreement in the bankruptcy of TMS. Dkt. No. 429 at 27-28. Lindell asserts that this failure to disclose prejudiced his employees and clients, witnesses, the prosecution, and the

---

[7]Lindell also provides no explanation as to why any of the questions he lists in Claim Seven would have been helpful to his defense. For example, in one question, Lindell asks whether the promissory notes he issued might not be considered securities. However, the testimony at trial was clear that they were. *See* 5/6/15 Tr. at 13:22-18:5.

jury.  Second, in about four pages of single-spaced writing, Lindell alleges that "misconduct" by "officers of the court" and witnesses affected his trial.  *Id.* at 29-33.

These allegations are premised upon nothing more than Lindell's speculation about the purported effect of a bankruptcy settlement agreement, which, as the government points out, was not introduced into evidence at trial.  *See* Dkt. No. 465 at 53.  Moreover, the issues Lindell raises with respect to the conduct of others during the *bankruptcy* proceeding is entirely irrelevant to his *criminal* trial, or, more specifically, anything Wolff did.  Similarly, with respect to the alleged misconduct of witnesses and officers of the court, while the accusations are lengthy, none of them are relevant to the performance of Wolff at trial.  Indeed, in some of the examples of alleged misconduct, Lindell acknowledges that Wolff examined witnesses on the matter or presented a defense witness, Stephen Hironaka, to rebut those of the government.  *See* Dkt. No. 429 at 30, 33.[8]

---

[8]One of the running themes in these allegations of misconduct relates to Otsuka's use (or lack thereof) of a computer software program called QuickBooks.  Although it is not perfectly clear, it appears that Lindell believes that Otsuka should have relied, or did rely, on QuickBooks, rather than LIBR, to trace investor funds.  *See* Dkt. No. 429 at 30-33.  As discussed above, contrary to Lindell's continued contention, LIBR is not a "discredited" means of tracing commingled funds.  Moreover, Lindell presents no evidence, other than his say-so, that QuickBooks−an accounting software program−can be used to trace commingled funds.  Further, he ignores that QuickBooks was discredited at trial, given that Lindell himself acknowledged that he had altered entries in QuickBooks to obtain a loan.  *See* 5/18/15 Trial Transcript at 117:1-10, Dkt. No. 275; *see also* 5/22/15 Tr. at 56:24-57:3 ("The reason that we did not want to rely on QuickBooks is because of the falsified financial statements that occurred in the amount of over 400,000 in the QuickBooks financials. And so it tainted the accounting records and whether we could rely on it.").

Accordingly, Claim Eight is denied.

**9.    <u>Claim Nine</u>**

In his ninth claim, Lindell repeats many of the same evidentiary arguments made in previous claims and asserts that Wolff was ineffective for failing to make them.  To the extent Lindell's arguments can be shoehorned into an ineffective assistance of counsel claim, Lindell ignores that, in closing, Wolff did argue that there was evidence suggesting a lack of intent to defraud, such as Lindell speaking to Cunningham about TMS' finances.  The jury's verdicts reflect that that argument was not believed.  Further, this Court will not second-guess Wolff's professional judgments to include some examples of an alleged lack of intent, while not pressing others.  Finally, even if Wolff had used every one of the alleged examples listed in this claim, they would still not disturb the evidence that Lindell and Hoaeae lied to their clients and used their clients' money for their own personal purposes.

Accordingly, Claim Nine is denied.

**10.    <u>Claim Twelve</u>**

In his twelfth claim, which Lindell describes as a "[d]eprivement of due process[,]" he asserts that the government has caused him to go blind while he has been incarcerated.  Dkt. No. 429 at 39.  Lindell further asserts that, even if he was not blind, he would not be able to "fairly defend" himself because the coronavirus

has caused a lockdown and quarantine at his prison.  *Id*.  Lindell asserts that, in light of his prison conditions, attorneys should be appointed to represent him and Hoaeae in this proceeding.

As the government asserts in its response, this claim is clearly not an attack on Lindell's conviction or sentence.  Dkt. No. 465 at 58.  Rather, at best, it appears that Lindell is challenging the conditions of his confinement, which is beyond the purview of his Section 2255 Motion.  *See Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) ("Habeas corpus proceedings are the proper mechanism for a prisoner to challenge the legality or duration of confinement.  A civil rights action, in contrast, is the proper method of challenging conditions of confinement.") (quotations, citation, and ellipsis omitted).  Therefore, to the extent Claim Twelve can be construed as a standalone claim for habeas relief, it is denied.

As for Lindell (and Hoaeae's) request for counsel, the same is denied.  There is no constitutional right to counsel in a Section 2255 proceeding.  *United States v. Angelone*, 894 F.2d 1129, 1130 (9th Cir. 1990).  Instead, by statute, counsel may be appointed to an indigent petitioner if a court "determines that the interests of justice so require…."  18 U.S.C. § 3006A(a)(2)(B).  Here, the Court does not find that appointing counsel would be in the interests of justice.  First, as to Lindell, he adequately articulates multiple grounds in support of his Section 2255 Motion.  Second, as to both Lindell and Hoaeae, given that all of their claims, bar one,

involve the alleged ineffective assistance of counsel, and the record conclusively shows, at the very least, that Lindell and Hoaeae suffered no prejudice from their attorneys' performance, they have little likelihood of success on the merits of their claims. *See Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983) (explaining that, in a habeas proceeding, a court should consider "the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims *pro se* in light of the complexity of the legal issues involved.").[9]

## 11.   <u>Post-Trial Counsel</u>

At the start of his first claim, Lindell argues that, "[o]n all [g]rounds in this motion my Government appointed attorney refused to claim ineffective [a]ssistance of [c]ounsel and would not investigate evidence outside of the court record." Dkt. No. 429 at 13.  Although this assertion does not identify the attorney allegedly at fault, because it is premised on one attorney not claiming ineffective assistance of counsel against a prior one, the Court presumes that Lindell (and Hoaeae) are arguing that Panagakos and Kagiwada, respectively, were ineffective in this regard.  Construed as such, this argument is denied.

As an initial matter, this argument ignores that the appropriate time to first raise a claim of ineffective assistance of counsel is on collateral review, *i.e.,* now,

---

[9]The Court also notes that, with respect to Hoaeae, there is no contention that she is blind or any complaint regarding the conditions of her confinement.

*not* on direct appeal or at any earlier time when Panagakos and Kagiwada were counsel of record. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) ("The better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under § 2255."). Second, as discussed herein, each of the claims of ineffective assistance of counsel raised in the Section 2255 Motions is meritless. Therefore, Panagakos and Kagiwada could not, in turn, have been ineffective in failing to raise meritless claims.

Finally, as the government asserts in its response, Lindell's contention that Panagakos and/or Kagiwada failed to investigate evidence outside of the court record is simply inaccurate. *See* Dkt. No. 465 at 59. Among other things, Panagakos (joined by Kagiwada) notably sought and obtained Criminal Justice Act (CJA) funds to hire Duane Seabolt, CPA−the type of professional Lindell repeatedly asserts should have been retained as part of his trial defense. Dkt. Nos. 243, 289. In his report, Seabolt stated that he "did not find any substantial errors" in the government's use of LIBR and, without LIBR, it was "practically impossible" to account for the flow of money into and out of TMS' bank account due to Lindell's commingling of monies. Dkt. No. 465-6 at 3. Seabolt further stated that data from QuickBooks was "unreliable" due to Lindell altering the same and that Lindell and Hoaeae "wrote checks to themselves" with monies from PL investors that were supposed to be invested. *Id*. at 3-4. In sum, Seabolt's report

contradicts the principal thrust of the Section 2255 Motions—that Lindell and Hoaeae's convictions should be overturned because LIBR "falsely represent[ed]" the use of PL funds. *See* Dkt. No. 429 at 15. As relevant to this claim, though, simply because Panagakos and Kagiwada's post-trial investigation did not uncover helpful information does not mean that they did not try.

Accordingly, any claim that Panagakos or Kagiwada rendered ineffective assistance of counsel is denied.

## 12. **Evidentiary Hearing**

In the Section 2255 Motions, Lindell and Hoaeae request an evidentiary hearing. Pursuant to Section 2255(b), a court shall grant a prompt hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief…." 28 U.S.C. § 2255(b).

As the Court has detailed herein, the record conclusively shows that Lindell and Hoaeae are not entitled to the relief they seek in the Section 2255 Motions. In short, Lindell and Hoaeae's counsel neither performed deficiently nor prejudiced their clients. Further, the one non-ineffective-assistance claim raised in the Section 2255 Motions (Claim 12) is not cognizable in this proceeding. The Court, thus, finds that an evidentiary hearing is not warranted.

13.    **Certificate of Appealability**

In denying the Section 2255 Motions, the Court must also address whether Lindell and/or Hoaeae are entitled to a Certificate of Appealability ("COA").  *See* R. 11(a), Rules Governing Section 2255 Proceedings.  A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard is met only when the applicant shows that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel,* 529 U.S. 473, 483–84 (2000) (internal quotation marks omitted).  In light of the findings herein, the Court concludes that reasonable jurists would not debate the resolution of the Section 2255 Motions.  Accordingly, the Court DENIES both Lindell and Hoaeae the issuance of a COA.

**CONCLUSION**

For the foregoing reasons, the Court DENIES the Section 2255 Motions, Dkt. Nos. 429, 430.  In addition, the Court DENIES a COA.

The Clerk is directed to enter Judgment in favor of Respondent, the United States of America, and then close Case No. 20-cv-352 DKW-WRP and Case No. 20-cv-353-DKW-WRP.

IT IS SO ORDERED.

Dated:  January 29, 2021 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

---

*Lindell v. United States*; CR. NO. 13-00512-1 DKW, CV. NO. 20-00352 DKW-WRP; *Hoaeae v. United States*; CR. NO. 13-00512-2 DKW, CV. NO. 20-00353 DKW-WRP; **ORDER (1) DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE; AND (2) DENYING CERTIFICATE OF APPEALABILITY**