IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GEORGE LINDELL,<br><br>Defendant. | Case No. 13-cr-00512-DKW-1<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE** |

Approximately 68 months into his 210-month sentence, Defendant George Lindell asks the Court to reduce his sentence to time served because of his loss of sight while under the care of the Bureau of Prisons, the COVID-19 pandemic, and the incapacity of his spouse and her inability to care for their 8-year-old special needs son. The Court finds that Lindell's preventable vision loss constitutes an extraordinary and compelling reason warranting the reduction he seeks. Despite the contemptible nature of his crimes, his failure to take responsibility, and his apparently cavalier attitude towards his many victims, Lindell did nothing to deserve the loss of what many consider to be their most vital sense. This needless loss materially alters the Court's sentencing analysis and commands Lindell's compassionate release. The motion, Dkt. No. 468, is GRANTED.

# RELEVANT BACKGROUND

## I. Underlying Crime

On May 27, 2015, a jury found Lindell guilty of multiple counts of mail fraud, wire fraud, and money laundering. Dkt. Nos. 195, 200. The underlying conduct included a Ponzi scheme in which Lindell lured potential investors with the promise of guaranteed returns only to use the invested funds in an unsustainable high-risk portfolio and to maintain his lavish lifestyle. Dkt. No. 352 at 6–17. On September 15, 2016, the Court sentenced Lindell to 210 months' imprisonment to be followed by five years of supervised release. Dkt. Nos. 354, 356. The Court also ordered Lindell to make significant restitution payments to the many victims of his crimes. Dkt. No. 356 at 7–9.

The Court imposed a sentence at the high end of the guideline range "[d]ue to the devastating impact on the numerous victims, and the defendant's lack of remorse [and] acceptance of responsibility." Dkt. No. 357 at 2. That devastating impact included defrauding more than a hundred victims out of nearly nine million dollars, in many cases wiping out families' entire home equity or life savings. *See* Dkt. No. 356 at 7–9; *see also* Dkt. No. 352 at 18–30. Moreover, at sentencing, when Lindell had the opportunity to acknowledge the destruction he wrought and, indeed, allocuted at length, he instead presented no "shred of contrition" or "remorse." Dkt. No. 385 at 34–58; *see also* Dkt. No. 352 at 30–31.

## II. Delay in Diagnosing and Treating Lindell's Age-Related Macular Degeneration

In 2015, Lindell entered Bureau of Prisons ("BOP") custody without any vision issues. Dkt. No. 468-4 (Lindell writing he "was admitted to FDC Honolulu with two good eyes"). By March 2017, that changed. Lindell reported to prison health officials that he was having difficulty reading a white board and small print. Dkt. No. 475 at 112. At first, the BOP acted promptly, recommending, on April 5, 2017, an ophthalmology exam. *Id.* at 75. That exam, however, for reasons that are not reflected in the record, did not occur until December 13, 2017, more than eight months later. *Id.* at 107. By then, a doctor called for an expedited retinal evaluation and the administration of eye vitamins. *Id.*[1]; *see also* Dkt. No. 468-1 at 17.

Lindell was diagnosed with age-related macular degeneration ("AMD") on January 8, 2018.[2] Dkt. No. 475 at 133, 139; *see also* Dkt. No. 468-1 at 17–18. On March 5, 2018, BOP Health Services referred Lindell to a retina specialist for "probable intravitreal injection." Dkt. No. 475 at 127–28. Eight months passed,

---

[1] The doctor's notes from the December 13, 2017 exam are difficult to read. *See* Dkt. No. 475 at 107. However, BOP Health Services memorialized these notes in their own records, *see id.* at 133.

[2] Though an August *2015* medical record notes that Lindell "recall[ed] that he was told he has macular degeneration" in both eyes, no formal diagnosis from that time is evident in the record. *See* Dkt. No. 475 at 3; *see also* Dkt. No. 468-4 (Lindell writing he was diagnosed with "maculate [sic] degeneration" in 2015). Further, the Government does not challenge the January 2018 onset date.

3

once again for reasons that are not apparent in the record, before Lindell was seen by the retina specialist. *Id.* at 142–44. On November 29, 2018, Lindell received his first Avastin injections to treat his AMD. *Id.* Doctor notes indicate that, at that time, Lindell's "blurred vision" was "severe." *Id.* at 142. Further, those notes state that Lindell "will need monthly injections" and that he was to return for a follow-up examination in "5 weeks." *Id.* at 143. BOP Medical Services memorialized Lindell's retina exam and acknowledged that he "need[ed] a 5-week follow-up visit" with a retina specialist. *Id.* at 126.

Despite these instructions, Lindell was seen by an ophthalmologist—not a retina specialist—on May 9, 2019, *five months* later. *Id.* at 224. It would be another three months before he saw a retina specialist in August 2019 and received a second set of Avastin injections. *Id.* at 220. Doctor notes from that visit state that monthly Avastin injection in both eyes were "necessary to preserve some vision!" *Id.* at 221. Despite this doctor's note—and an identical one a month later—Lindell has received intravitreal injections just twice since December 2019. Dkt. No. 468–1 at 20–21; Dkt. No. 475 at 229, 273–74. As Lindell summarizes, "in the past 35 months, [he] has received 7 injections in his left eye and only 6 in his right eye," despite BOP's consultants, as early as 2018, identifying a "monthly" treatment need to save his vision. Dkt. No. 468-1 at 21.

4

### III.  Motion for Compassionate Release

On December 31, 2020, Lindell filed a motion for sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) ("compassionate release motion").  Dkt. No. 468.  Lindell argues that three extraordinary and compelling reasons independently warrant a sentence reduction.  First, he argues the COVID-19 pandemic itself presents an extraordinary and compelling reason warranting release.  *Id.* at 5–8.  Second, he argues his rapidly deteriorating eyesight, which has left him blind in one eye and partially blind in the other, warrants his release.  *Id.* at 8–12.  Finally, he argues that he must be released to help care for his eight-year-old son, who has special needs, because Lindell's spouse, the child's primary caregiver, suffers from medical conditions that make it difficult for her to work and provide the care that the child needs.  *Id.* at 12–14; Dkt. No. 468-9.

On January 26, 2021, the Government filed a response opposing any sentence reduction, Dkt. No. 478, to which Lindell replied on February 2, 2021, Dkt. No. 482.  This order follows.

## LEGAL STANDARD

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances."  *Dillon v. United States*, 560 U.S. 817, 824 (2010) (alterations in original) (quoting 18 U.S.C. § 3582(b)).  Such circumstances must

be "expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Dillon*, 560 U.S. at 827, 831; *United States v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003).

Congress carved out one such circumstance in 18 U.S.C. § 3582(c)(1)(A)(i). A court may "modify a term of imprisonment" upon an inmate's motion if:

1. the inmate exhausted "all administrative rights to appeal a failure of the [BOP] to bring a motion" on his behalf or 30 days has lapsed since the relevant warden received a request to do so;

2. the inmate has established that "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable [Sentencing Commission] policy statements";

3. the court considers the sentencing factors set forth in 18 U.S.C. § 3553(a) and finds the inmate is "not a danger to the safety of any other person or the community," as provided under 18 U.S.C. § 3142(g).

*See* 18 U.S.C. § 3582(c)(1)(A)(i); U.S.S.G. § 1B1.13 (policy statement). The inmate bears the burden of establishing the requirements for a sentence reduction by a preponderance. *See, e.g., United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998); *see also Walton v. Arizona*, 497 U.S. 639, 650 (1990) (a defendant's due process rights "are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency"), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 609 (2002).

## DISCUSSION

The parties dispute only the second and third requirements detailed above.³ The Court agrees with Lindell that his deteriorating eyesight—particularly in light of the fact that such deterioration could have been delayed or wholly arrested but for the failure to timely provide appropriate medical treatment—presents an extraordinary and compelling reason warranting a sentence reduction. And given this debilitating medical condition, which more than challenges the 73-year-old Lindell insofar as providing self-care in the prison environment is concerned, and which leaves him with little ability to endanger community safety, the sentencing analysis has changed such that the goals of sentencing set forth in Section 3553(a) would not be undermined if a sentence reduction is granted. For these reasons, his motion for compassionate release is GRANTED.

### I.   Extraordinary and Compelling Reasons

Section 3582(c)(1)(A)(i) permits a sentence reduction only upon a showing of "extraordinary and compelling reasons" and only if "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission" (the "Commission"). As this Court has explained, it is bound by the

---

³In other words, the Government concedes exhaustion. Dkt. No. 478 at 6 ("Because it appears clear to government counsel that Lindell made a request for compassionate release in May 2020, [the Government] do[es] not object with proceeding on his motion."); *see also* Dkt. No. 468-3 (compassionate release request sent to Lindell's case manager on May 21, 2020); Dkt. No. 479-1 (warden reportedly denying Lindell's compassionate release request on June 3, 2020).

Commission's Commentary in U.S.S.G. § 1B1.13 regarding what constitutes an "extraordinary and compelling" reason warranting a sentence reduction. *See, e.g., United States v. Aruda*, No. 14-CR-00577-DKW, 2020 WL 4043496, *2–*5 (D. Haw. July 17, 2020).[4]

Relevant to Lindell's motion, the Commission explains that the following extraordinary and compelling reasons may warrant a sentence reduction:

> (A) Medical Condition of the Defendant.—
>     (i) . . . .
>     (ii) The defendant is—
>         (I) suffering from a serious physical or medical condition,
>         (II) suffering from a serious functional or cognitive impairment, or
>         (III) experiencing deteriorating physical or mental health because of the aging process,
>     that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
> (B) . . . .
> (C) Family Circumstances.—
>     (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>     (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

U.S.S.G. § 1B1.13 n.1(A), (C).

---

[4] The Court disagrees with Lindell's conclusion to the contrary. *See* Dkt. No. 468–1 at 4 n.1 ("courts may independently determine whether such 'other reasons' are present in a given case, without deference to the BOP's judgment").

The Court finds the ongoing and preventable deterioration of Lindell's eyesight meets this criteria and presents an extraordinary and compelling reason warranting a sentence reduction.[5]

## II.   Applying the Policy Statement

Lindell's ongoing loss of sight—coupled with a failure to receive adequate treatment—clearly meets both the language and spirit of the Commission's Policy Statement.  *See* U.S.S.G. § 1B1.13 n.1(A).  The portion of the policy statement relevant to Lindell's loss of sight requires Lindell to prove three elements by a preponderance:

1. He is "experiencing deteriorating physical . . . health because of the aging process";

2. That deterioration "substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility"; and

3. He is "not expected to recover" from the underlying condition.

*See* U.S.S.G. § 1B1.13 n.1(A)(ii)(III).[6]  Lindell has met his burden.

---

[5]In light of this finding, the Court considers Lindell's claims concerning COVID-19 and his wife's incapacitation to be moot.

[6]Because it does not affect the outcome here, the Court does not determine whether blindness itself *may* qualify as a serious medical condition pursuant to U.S.S.G. § 1B1.13 n.1(A)(ii)(I).  While *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014)—cited by Lindell, Dkt. No. 468-1 at 10—provides support for such a finding, it is not directly on point.  The court there held blindness in one eye caused by a treatable underlying condition qualified as a serious medical *need* for purposes of Section 1983 litigation, not that blindness itself constitutes a serious medical condition under U.S.S.G. § 1B1.13 n.1.  *Colwell*, 763 F.3d at 1066.  This is not a distinction without a difference.  Holding that prison officials may be held liable for deliberate

As detailed above, Lindell is going blind.  He represents that he "has lost almost all of his vision in his left eye due to AMD."  Dkt. No. 468-1 at 8.  And he is rapidly losing sight in his right eye due to the same condition.  *Id.*  The Government, for its part, does not dispute these allegations, admitting "Lindell does have vision loss in his left eye, and some vision loss in his right eye."  Dkt. No. 478 at 12.  Thus, it is clear to the Court that, because of his undertreated AMD, Lindell is "experiencing deteriorating physical . . . health because of the aging process."  *See* U.S.S.G. § 1B1.13 n.1(A)(ii)(III).  In fact, this type of medical condition, *age-related* macular degeneration, appears to be precisely the type of condition contemplated by the policy statement.

While the Government disagrees, Dkt. No. 478 at 10–12, the record clearly shows Lindell's AMD and the BOP's failure to provide adequate treatment, "substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility."  *See* U.S.S.G. § 1B1.13 n.1(A)(ii).  Two sets of facts are compelling: (1) Lindell's deteriorating eyesight is making it difficult for him to safely perform daily tasks of living in a correctional facility; and (2) his ongoing incarceration will likely continue to prevent him from accessing reasonable, adequate medical treatment for his AMD.

---

indifference to an inmate's treatable blindness and that blindness itself is a serious medical condition that might entitle an inmate to a sentence reduction are not the same.

Lindell represents that his "[p]oor eyesight causes his balance to be off—he has difficulty remaining steady even while following a wall." Dkt. No. 468-1 at 11. He has injured himself by accidentally walking into a fence, "has hit his head on low over-hangs and other objects," and "regularly stumbles over curbs and cracks or uneven payment." *Id.* These representations—none of which are difficult to imagine—show that Lindell's deteriorating eyesight has made it challenging for him to safely navigate within his correctional facility. The Court is persuaded that these safety issues will likely be exacerbated by his impending move to a new correctional facility. *See id.* at 11–12. Lindell became familiar with FCI Terminal Island when his vision was still reasonably good. *See* Dkt. No. 468-4 at 1–2. Given the current state of his vision, it will, undoubtedly, be more difficult for him to get his bearings at FCI Miami when, eventually, he arrives there. *See* 468-1 at 11–12. Thus, Lindell's movements at FCI Miami will likely be "severely restricted," making attending to daily tasks of life more difficult. *See id.*

But even more troubling to the Court is the fact that, if Lindell is left incarcerated, he will likely continue to lose his sight while sight-saving treatments are denied him. Providing self-care necessarily contemplates an ability to access reasonable, relatively prompt, and adequate medical care when there is a pressing need for it. That is because taking care of oneself includes attending to one's own medical needs, even indirectly. For instance, an individual with high blood

11

pressure engages in self-care by choosing to visit his doctor, filling his prescription, and taking his high blood pressure medication. Other than, perhaps, bathing and eating, there can be no more fundamental example of self-care than attending to one's own health.

Inmates must, necessarily, rely on the BOP to fulfill this aspect of self-care. But it is still incumbent upon prisoners to ask for a doctor's visit when something is wrong and engage in any treatment protocol prescribed. Lindell has clearly not had the opportunity to attend to his own medical needs while incarcerated. In fact, he has been denied that ability, despite bureaucratically screaming for it. Dkt. No. 468-7 at 2 (Lindell explaining to the BOP in October 2018 that he has not had the recommended medical consult and his "eyesight continues to deteriorate"); *id.* at 4 (June 2019, he again asks for help); *id.* at 5 (July 2019, begs the BOP: "please get me treatment ASAP before I go completely blind in both eyes. My left eye is already gone"); *id.* at 6–7 (August 2019); *id.* at 8 (January 2020); *id.* at 9–10 (February 2020); *id.* at 11 (March 2020); *id.* at 12 (June 2020); *id.* at 13 (July 2020).

The Court is clearly not the only one disturbed by this record. It is worth quoting the Government's candid assessment at length:

> [T]he government must acknowledge that while Lindell has received treatment for his AMD, it does not appear to have been consistent or sufficient. The failure to provide timely care is problematic and works to frustrate the efforts of this Court, and all of those who have sought

> justice for the victims in this case. While Lindell's AMD is not the fault of BOP, the BOP is charged with his care. Government counsel has spoken with local BOP counsel and, based on his conversation with local BOP counsel at USP Yazoo City, has been assured that Lindell will be receiving a visit with an ophthalmologist on an emergency and priority basis. Government counsel intends to follow up with BOP to ensure that Lindell receives all necessary medical care during his time in BOP custody.

Dkt. No. 478 at 20. While the Court appreciates Government counsel's efforts to assure the Court, and especially Lindell, that he will receive what will hopefully be sight-saving treatments in the future, these efforts do not minimize what has already occurred. Moreover, while the Court has no doubt that the Government's counsel will do what he says, the Court, quite frankly, has little confidence, based on this record, that the BOP will. That is particularly true, given the absence of any enforceable, written commitment by the BOP or even the affidavit of a warden or some other officer charged with Lindell's care. The BOP has neglected Lindell long enough. Their delays, it appears to the Court, have cost this man his vision, and he should be allowed to pursue his care to preserve what little eyesight he has left without the need to rely on those who have put him in this position in the first place. The Court finds Lindell's ability to provide self-care will be substantially inhibited should he remain in BOP custody.

Finally, Lindell is not expected to recover from AMD. While "[t]reatments are available that may help slow disease progression, preserve existing vision and,

13

if started early enough, recover some lost vision," there is no cure.[7] "AMD is the leading cause of permanent impairment of reading and fine or close-up vision among people aged 65 years and older."[8] The Government cites no evidence to support a contrary finding. Thus, this element is satisfied.

The Court finds that, because Lindell has demonstrated he is experiencing deteriorating physical health due to the aging process, that deterioration substantially diminishes his ability to provide self-care while incarcerated, and he is not expected to recover, he has met his burden of showing an extraordinary and compelling reason warranting a sentence reduction.

### III. Section 3553(a) Factors & Risk of Danger to the Community

Lindell has demonstrated that an extraordinary and compelling reason warrants a sentence reduction. But the analysis does not end there. The Court must consider any such reduction in light of the sentencing factors set forth in 18 U.S.C. § 3553(a) and determine whether Lindell is "a danger to the safety of any other person or the community, as provided under [18 U.S.C. §] 3142(g)." *See* 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13.

---

[7] *Wet Macular Degeneration*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/wet-macular-degeneration/diagnosis-treatment/drc-20351113 (last visited Feb. 4, 2021).
[8] *Common Eye Disorders: Age-Related Macular Degeneration*, CDC, (last reviewed June 3, 2020), https://www.cdc.gov/visionhealth/basics/ced/index.html (last visited Feb. 4, 2021).

Considering the Section 3553(a) factors, the Court finds Lindell's 210-month sentence was *at sentencing*, "sufficient, but not greater than necessary, . . . (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public." *See* 18 U.S.C. §3553(a)(2). But as a result of Lindell's current physical condition, and the admitted failures by the BOP that appear to have resulted in that condition, the sentencing analysis has changed. The Government acknowledges as much: "[w]e concede that Lindell has some strong and compelling arguments concerning his fate *following the sentencing* in this case." Dkt. No. 478 at 19 (emphasis added).

The Government is correct that that fate, and, in particular, the BOP's "failure to provide timely care . . . works to frustrate the efforts of this Court, and all of those who have sought justice for the victims in this case." Indeed, the Court, not reasonably foreseeing such failures, sentenced Lindell to what it then considered, under all of the circumstances, to be a fair and just punishment for his crimes. But the Court cannot ignore what has happened since. Through years of not receiving timely medical visits and prescribed monthly treatments, Lindell has, to a large degree, lost his sight. If the Court fails to grant Lindell the relief he now seeks, it is justifiably concerned that "to a large degree" will become "completely." As the Government vigorously argues, Dkt. No. 16–20, the severe impact of

15

Lindell's crimes on his victims cannot be overstated. But neither can the significant impact losing his sight will have on Lindell's quality of life. At his initial sentencing, the Court was not balancing these facts. Now, it is.

Given this background, the Court has re-considered all of the Section 3553(a) factors and determined that, on balance, granting Lindell's prompt release does not undermine the goals of sentencing. A few factors are worth noting, as they have changed since Lindell's initial sentencing. The Court is instructed to consider "the need for the sentence imposed to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). While the Court was convinced that a 210-month term of imprisonment would do just that, it must consider now that part of the "punishment" imposed was Lindell's vision loss, an outcome that appears to have been preventable. The Court agrees with Lindell that such punishment would not be "just." *See* Dkt. No. 468-1 at 16. Likewise, the Court must consider the sentence imposed in the context of the Government's responsibility "to provide the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The record in this case is clear: Lindell has not and likely will not get the medical care he needs in an effective manner while incarcerated. The BOP has had years to show otherwise and has not done so.

Finally, the Court finds that Lindell presents little, if any, danger to any person or the community in his current state or, to the extent that he does,

conditions of release can be reasonably fashioned to address them. Lindell's crimes involved sophisticated financial instruments and bookkeeping. Given the state of his vision, his advancing age, and the lack of access to his partner in crime, his co-defendant daughter, who remains incarcerated, engaging with these instruments and intricate accounting will be difficult, if not impossible. Further, Lindell relied on his community connections and used the success of his legitimate business enterprise to prey on victims. Settling in another state, nearly 5,000 miles away, where he has neither those connections nor legitimate business renders the risk of him perpetrating similar crimes extraordinarily low.

## **CONCLUSION**

For the reasons set forth herein, Lindell's motion for compassionate release, Dkt. No. 468, is GRANTED. Lindell's sentence is reduced to time served, and the BOP is instructed to release Lindell as soon as practicable. Lindell is thereafter ORDERED to immediately begin serving his previously ordered five-year term of supervised release. Lindell's release is also subject to the following:

1. Within 72 hours of release from custody, Lindell must contact the United States Probation Office for the District of Hawai'i by telephone at (808) 541-1283, or such other Probation Office as instructed by Probation or the Court;

2. Counsel are instructed to contact Probation immediately regarding the

terms of this Order and Lindell's release and may propose additional or modified supervised release conditions, as appropriate; and

3. If Lindell returns to Hawaii, rather than Florida or another Court-approved destination, for supervised release, Lindell must comply with the 10-day self-quarantine or other mandate required by State law.

IT IS SO ORDERED.

DATED: February 5, 2021 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

*United States v. George Lindell*, Criminal No. 13-00512-DKW-1, **ORDER GRANTING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**